No. 32,254

CLYDE GARDENHIRE and BELINDA GARDENHIRE, *Appellees*, v. SINCLAIR-PRAIRIE OIL COMPANY et al., *Appellants*.

(44 P. 2d 280)

Opinion filed May 4, 1935.

*Charles W. Roberts, James A. McDermott,* both of Winfield, and *Albert Faulconer,* of Arkansas City, for the appellants.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *W. E. Cunningham,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action was brought by Clyde Gardenhire and Belinda Gardenhire against several oil companies named as defendants, to recover damages for salt water and other deleterious matter which was discharged from oil wells in the vicinity of their land. Plaintiffs' land consists of a tract of land adjacent to the city of Winfield, a part of which is included in the city limits. They purchased the farm in 1917 and have since used it as a dairy farm. It is watered by Timber creek, a clear stream of water which ran through the farm, cutting off five acres on the east side of the stream and leaving 38 acres on the north and west of it. Some of the wells were drilled a mile or a mile and a half away, and from these wells, it is alleged, salt water was allowed to escape and pollute the water of the stream and destroy considerable property. In February, 1933, the plaintiffs brought an action against the several defendants to recover damages. They alleged that the salt water and oil refuse had been allowed to escape and had poisoned wells which they had used for house and other purposes; that their animals, hogs, cattle and horses, sickened and some of them died from using the water for the two years previous; that it had permeated the soil, rendering it unproductive for the past

two years and they asked for permanent damages of $12,500 by reason of damage to the farm, and having been done willfully and unlawfully they asked for $5,000 as exemplary damages.

Special questions were submitted by the court and answered as follows:

"Q. Was the water in Timber creek running through plaintiffs' premises, and the water wells on plaintiffs' premises suitable for domestic, livestock and agricultural purposes before March 1, 1931? A. Yes.

"Q. Do you find the pollution first affected plaintiffs' property shortly after March 1, 1931? A. Yes.

"Q. Did Timber creek continue to be polluted during 1932 and 1933? A. Yes.

"Q. What do you find was the fair, reasonable cash market value of plaintiffs' entire farm immediately before the spring of 1931? A. $7,800.

"Q. What do you find was the fair, reasonable cash market value of plaintiffs' entire farm immediately after the pollution? A. $4,700.

"Q. If you find for the plaintiff, then state how much you allow for loss of dairy products. A. None.

"Q. Do you find that defendants, Sinclair-Prairie Oil Company, the Roth and Faurot Oil and Gas Company, the T. M. Deal Oil and Gas Company, and Earl Wakefield, polluted the water of Timber creek and the tributaries emptying into Timber creek and plaintiff's water supply by permitting and allowing waste crude oil, base sediment, salt water and other minerals and waste products to escape from their oil wells and plants used in operating said wells after March 1, 1931? A. Yes.

"Q. How much damage, if any, do you find plaintiffs sustained to that portion of their premises lying east of Timber creek? A. $500.

"Q. How much damage, if any, do you find plaintiffs sustained to that portion of their lands other than the portion east of Timber creek? A. $2,600.

"Q. How much damage, if any, do you find plaintiffs sustained on account of their loss of ten hogs? A. None.

"Q. How much damage, if any, do you find plaintiffs sustained on account of loss of cows? A. None.

"Q. How much, if any, exemplary damages have you allowed plaintiffs? A. None.

"Q. If you find that the plaintiffs have suffered actual damage to any extent, in the manner as claimed by them, name such of the defendants, if any, that you find acted in a grossly wanton malicious and willful manner in inflicting such damage. A. Sinclair-Prairie Oil Co., Roth and Faurot Oil and Gas Co., T. M. Deal Oil and Gas Co., Earl Wakefield.

"Q. If you find that the water in Timber creek is polluted, state when the same first became polluted. A. In the spring of 1931."

The principal objection to the judgment is that plaintiffs had been damaged more than two years before the bringing of the action, and were barred by the statute of limitations.

Wells were drilled in 1926 to gas found at a depth of about 2,900 feet, and little water was discharged from these, but in 1931 the wells were deepened to a stratum in which oil was found, and with the oil there was a plentiful supply of water. Many ponds were made, but it overflowed them. Soon the surface of the water showed a marked characteristic of oil and other refuse of a poisonous nature. Up to that time the family had fished and caught lots of catfish, red horse, bass and black perch, but in the fall of 1931 few could be found there, except an occasional carp, which can live in water that has been polluted to some extent.

Plaintiffs testified that they were not injured or damaged by the water until 1932. One of plaintiffs and a member of his family testified as to his having undertaken to water peas in his garden, and having discovered that they turned brown and died. It continued to affect and damage when defendants increased the number of wells. Six of them, at least, were brought in in 1931. Defendants contend that when they erected the derricks and were producing oil it was all in sight of the plaintiffs and they could not help but know of it. Witnesses said that the gas wells were much shallower than the oil wells, and after they had been deepened there was a marked change in the production of water and refuse. There was then an unlawful distribution of salt water and deleterious matter, but it did not give a cause of action to plaintiffs until they had been injured. The defendants had the right to drill for oil, and if they did not bother or damage plaintiffs and the water and oil did not reach the premises of plaintiffs until 1931 plaintiffs would not have been warranted in bringing an action; and if they had brought one on conjecture or speculation prior to that time they might have been challenged for anticipation of injury and be subject to the rule laid down in Kansas by Justice Brewer, in which he said:

"There was here no trespass, no invasion upon the plaintiff's lands, or his rights, until the actual overflow and injury. Other cases might be cited, but enough have been to show the principle which underlies them, namely, that where the original act itself is no invasion of the plaintiff's rights, then there is no cause of action until such act has caused damage, and the right of action dates from that time." (*K. P. Ry. Co. v. Mihlman,* 17 Kan. 224, 230.)

In *Lackey v. Prairie Oil & Gas Co.,* 132 Kan. 754, 758, 297 Pac. 679, it was said:

"When the erection of an obstruction does not of itself cause injury to land, but subsequently causes injury by flooding the land, cause of action for injury to the land arises when the flooding occurs."

Plaintiffs had been using water from their wells daily, their stock had free access to and entered the creek daily, but there was no indication of oil, salt water or pollution until May or June, 1931. No witness could be found who would say there was salt water in plaintiffs' well or creek or that there was any oil or other pollutive substance in either well or creek until the summer of 1931.

This action was brought in February, 1933, and the principal question presented is: Was it brought in time? The time is fixed by the statute of limitations, which is two years. While wells had been drilled in 1926, and some salt water had been discharged, but none that injured plaintiffs, it was well established that the salt water did not reach or injure plaintiffs until late in 1931 or the first months of 1932. When the wells were deepened salt water was developed in such quantities that the ponds provided did not care for it. The drilling of a well is not unlawful. Those doing so may not strike oil; they may not strike a vein of water, or if they do they may be able to take care of the salt water in ponds or by other means, or the salt water may be found in such small quantities as not to be harmful. These wells were some distance from plaintiffs' land and it was a problem when, if ever, the salt water would reach their property. And after passing through the intervening territory in quantities sufficient to injure the plaintiffs, there was a question of the extent of the damage that would be sustained; it might only be speculative and conjectural.

The result was not like that produced in the case of *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899, where the plaintiff knew the property was subjected to the flow of the sewage from a city of fixed population. These facts were established when the sewer was constructed. It was found by the court that the plaintiff knew of the creation of the sewer system; knew there would be a constant and continuous flow of sewage; and knew that the stream would necessarily be polluted and affect the water flowing through his premises. The effect of the discharge of sewage could have been ascertained with reasonable certainty; the stream was polluted when the sewage was thrown into the stream, and therefore he should have brought an action for permanent damages at the beginning. The rule in such a case is stated in *City of Hutchinson v. Delano*, 46 Kan. 345, 26 Pac. 740, where it was said:

"The apprehended fouling or pollution of a stream of water in the future by the sewage of a part of a city from sewers which have been legally, scientific-

ally and properly constructed, but which has not yet taken place, and of which there is no immediate or imminent danger, and which depends upon a contingency that may not happen, does not present a case for an injunction." (Syl.)

See, also, *Brown v. Arkansas Central Power Co.*, 177 Ark. 1064; *McDaniel v. Power Co.*, 95 S. C. 268; *Conestee Mills v. City of Greensville*, 160 S. C. 10; *Backhouse v. Bonomi*, 9 H. L. Cas. 503.

This action was brought in time and was not barred by the statute of limitations.

The defendants had no right to pollute a stream or natural watercourse by prescription. Timber creek and the ravine leading into it were natural watercourses. The pollution of the stream was wrongful and therefore no permanent right can be acquired.

"The pollution of the stream being a wrongful act, no permanent right to continue it can be acquired; and, therefore, the damages to be awarded must be merely for the temporary injuries which have occurred to the time of trial or to the time of bringing the action, if, under the local practice, that is the time fixed for the computation of damages to be recovered in the action." (2 Farnham on Water and Water Rights, p. 1718, § 527. See, also, *Corby v. Ramsdell*, 48 Fed. 2d 701; *Mayor v. Land*, 137 Ala. 538.)

In *Clarke v. Boysen*, 39 Fed. 2d 800, the court remarked:

"It is settled law that a prescriptive right to maintain a public nuisance cannot be acquired." (p. 818.) See, also, *Fertilizing Co. v. Hyde Park*, 97 U. S. 659, 668, and Note in 39 A. L. R. 895.

Something is claimed by defendants of an isolated remark made by plaintiff when he testified in the case. He was asked:

"Q. I understand you to say the water in Timber creek had become bad two years before they started the Dempsey well? A. Yes, sir."

As a matter of fact, the witness had never said that the water in Timber creek became bad two years before they started the Dempsey well. He had repeatedly stated that the first he ever noticed anything wrong with the water was in May or June, 1931; that he never noticed anything wrong with the water of Timber creek or that there was any oil or salt in it until the summer or fall of 1931. The words "two years" were not noticed by counsel for plaintiffs until after the transcript was made. Whether he misunderstood the question or how he came to contradict his detailed evidence, it is in a way a denial of his previous testimony on the question of the time of commencing the action. The most that can be said of it is that it was a question of fact which the jury could and did settle—that Timber creek was not polluted until the spring of 1931.

Some of the instructions given and refused are criticised. One uses the words "material and perceptible" as applied to the statute of limitations. The question that had been tried was whether the plaintiff had a cause of action. Whether the use of the words was unreasonable, and was serious and substantial, or was slight and trivial, was submitted for decision. The words "material and perceptible" have been used in similar cases. (*Helms v. Oil Co.*, 102 Kan. 164, 169 Pac. 208.) The terms used were appropriate and applicable. (*Packwood v. Mendota Coal & Coke Co.*, 84 Wash. 47.)

The court refused to give requested instruction number 13, which was:

"If this plaintiff knew, or should have known, prior to February 28, 1931, that the defendants or any of them were at that time or had been for some time previous causing oil, salt water, acids, or other deleterious substances to be drained or washed into Timber creek upstream from plaintiffs' land, then the claim asserted by the plaintiffs would be barred by the statute of limitations."

The instruction was contradictory of another instruction which the defendants had requested, number seven, and the defendants are in no position to complain if the court adopted one rather than the other. The instruction was covered in instruction number five, and therein the court told the jury that if the pollution of the stream occurred two years prior to February 28, 1933, when this action was commenced, to such an extent as to be perceptible, and that plaintiffs knew or in the exercise of ordinary diligence could have ascertained that such pollution was of an extent to cause them injury, then the verdict should be for the defendant as to any damages to plaintiffs' land. If the pollution was to the extent to cause them injury, then they could not recover. Nothing was required beyond causing them injury, to start the statute. The given instruction was more favorable to defendants than the law warrants.

Defendants, by their requested instructions seven and thirteen, had requested the court to insert in the instruction the clause, "knew or by the exercise of reasonable diligence should have known," and the clause "should have known." Having requested it, they are in no position to complain.

Then they claim that the court erred in refusing to give instructions seventeen, eighteen and nineteen. These requested instructions related to the claim, which there was no evidence to support, that a well on Gardenhire's place, by a lessee, Dempsey, started on July 30, 1932, and plugged and abandoned that fall, contributed to

the pollution which the jury found began in the spring of 1931. The well produced neither oil nor gas. The Dempsey well was started on plaintiffs' premises July 30, 1932. Before this time—in fact, more than a year before—in May or June, 1931, plaintiffs' wells had been destroyed by defendants' pollution; the fish in the stream had been killed, as he saw "a world of dead fish in the fall of 1931, and spring of 1932"; many of the trees had been killed; the boys swimming in the creek in the summer of 1931 and 1932 would come out of the water with their bodies streaming with oil as though they had been painted. In short, the water in the wells and creeks was so polluted that the drillers could not use the water in their boiler, but were forced to buy city water, at a cost of over $700. The ground where the slush pond was dug was "as hard as buck shot, hardpan like." The ground where the pond was did not slope down to the creek. They used city water for drilling purposes. The water from the pond never went into the creek. When they stopped drilling the well on plaintiffs' premises it was not over thirty minutes until one of the drillers walked up to plaintiffs' house, and called into the city of Blackwell, and only a short while thereafter they began plugging the well. There was no contradictory evidence, nor any other evidence from which any inference could be drawn that the well on plaintiffs' premises polluted their own wells or creek or land.

Did the court err in submitting to the jury special interrogatories numbered one, two and three? These three questions determined the condition of the water in Timber creek and the wells on plaintiffs' premises before they were polluted; the time of their pollution and that such pollution had continued after the filing of plaintiffs' action. No objection was made by defendants to questions numbered two and three. There was no evidence that the waters of Timber creek were polluted substantially for four or five years next preceding the time the lawsuit was commenced.

Did the court err in refusing to submit appellants' special interrogatories numbered eight, nine and ten? They were:

"8. Did the plaintiffs, during the year 1932, drill or cause to be drilled, a well for oil and gas upon the land of the plaintiffs?

"9. If you answer the last question in the affirmative, state whether salt water produced from said well was deposited upon plaintiffs' land.

"10. Did the salt water deposited upon plaintiffs' land, produced from the well drilled on plaintiffs' premises, pollute or contribute to the pollution of plaintiffs' land?"

There was no issue as to these matters. It was not disputed that plaintiffs gave an oil and gas lease to Dempsey and that Dempsey, beginning on July 30, 1932, drilled a well on plaintiffs' premises. There was no evidence that the drilling of this well had any connection whatever with the pollution of plaintiffs' land.

Did the court err in refusing to give to the jury appellants' special interrogatories eight, nine and ten? Did the court err in overruling the separate motion of the Sinclair-Prairie Oil Company for a new trial? The pollution of plaintiffs' wells and Timber creek occurred in the spring of 1931, after the first of March. This pollution was continued through 1932 and 1933.

The evidence was sufficient to show that the Sinclair-Prairie Oil Company constructed the salt-water pond on the Youle lease in 1930 or 1931, and the large salt-water pond on the Dibbens lease, where the wells were deepened. The jury was not required to believe the bald oral statement of defendants' witness that the consolidation took place April 1, 1932. Even if they did, the pollution still continued and with increased violence. The Sinclair-Prairie Oil Company was liable for continuing the nuisance and was liable as the consolidated corporation. There was no error in overruling the separate motion of the oil company for a new trial.

There was no material error in the rulings, and the judgment is affirmed.