No. 35,755

GEORGE GLASS, *Appellee,* v. H. H. BRUNT, *Appellant;* MITCHELL BENTON and CHARLEY BROWN, *Defendants.*

(138 P. 2d 453)

Opinion filed June 12, 1943.

*Eldon R. Sloan,* of Topeka, argued the cause, and *E. R. Sloan, W. Glenn Hamilton* and *Floyd A. Sloan,* all of Topeka, were on the briefs for the appellant.

*Elisha Scott,* of Topeka, argued the cause for the appellee but filed no brief.

The opinion of the court was delivered by

DAWSON, C. J.: This was an action for damages for the tortious conversion of a compressor stolen from the cold-meat counter of the plaintiff's grocery store.

It appears that on the night of September 15, 1940, one Mitchell Benton stole the compressor with its operating motor and hid it in

an alley until next morning, when he took it to defendant's junk yard, and began to smash it with a sledge hammer. Brunt, the proprietor of the junk yard, had not yet arrived. One Charley Brown, a trucker, was there and helped Benton reduce the compressor to junk.

When Brunt arrived, Benton sold the broken compressor and its motor to Brunt for two dollars—telling him at the same time that it was "hot."

In plaintiff's petition it was alleged that the compressor and motor were worth $165; that defendant Brunt knew that it had been stolen, and that Charley Brown, who helped smash the machine, was the agent, servant and employee of Brunt. Plaintiff also alleged that he was deprived of the use of the machine for more than twenty days, which caused him a loss of time to the amount of $5 per day; that plaintiff was otherwise damaged to the amount of $200, and that he was entitled to punitive damages in the sum of $1,000. He concluded his petition with a prayer for $300 actual damages and for $1,000 as punitive damages.

Defendant Brunt's demurrer to this petition was sustained and plaintiff filed an amended petition alleging the same facts, but adding this allegation—

"That on or about the 8th day of April, 1941, and previous thereto a demand was made on the defendant Brunt for one thousand dollars and damages, by reason of his purchases of the said compressor and motor. That said defendant Brunt refused and still refuses."

Defendant's demurrer to this amended petition was overruled, and he filed a verified answer containing a general denial, and denying that Charley Brown was his agent, and denying that Brown assisted in tearing down the motor and compressor.

The cause was tried by the court without a jury. Benton, who had stolen the machine, testified he took it to the Brunt junk yard early in the morning and was admitted by Brunt's night watchman; that Charley Brown had helped him smash the compressor, and that when he sold it to Brunt he told him that it was "hot." A witness for plaintiff who had sold the machine to plaintiff in May, 1938, at a price of $165, testified that while he had not seen it since he sold it, assuming its ordinary wear and tear for a year and a half, it would have a value of $95.

Plaintiff testified that the cost of a machine to replace the one stolen would be $125; that his daily grocery sales would range from

$11 or $12 per day to $25 or $30 on some days; that the theft of the compressor had· caused a total loss of his business, which loss amounted to $5 per day "during the summer months." He also testified that he talked with Mr. Brunt—

"He asked me what was they going to do about my motor there. He said he had to pay a man to watch the yard and it may get stolen, and I told him I would talk with my attorney, and I think you wrote him a letter about it."

On cross-examination plaintiff admitted that he kept no books and paid no income tax during 1938, 1939, and 1940; that he could not state what was the net profit of his business per day; but that he had to make a profit of $5 or $6 per day—"to pay my overhead expense and pay for my equipment."

Charles C. Lytle, a member of the Topeka police force, testified that on September 20, 1940, he investigated the burglary and robbery at plaintiff's grocery store, and learned that the stolen property was at Brunt's junk yard; that he spoke to Brunt about it; that the latter showed him the motor which had been repaired for pipe cutting; that he gave Brunt a hold order on the machine,. and Brunt said he would hold it until he got further orders from· the police department.

Defendant Brunt's demurrer to plaintiff's evidence was overruled, and evidence was adduced in his behalf. In his testimony he denied that Benton told him the machine was "hot"; that the compressor was merely junk when he first saw it and bought it; that the motor was not damaged except the wires were cut off from it; that he did not inquire of the seller where it had come from; and that he had no reason to believe it had been stolen.

Charley Brown (Charles R.) testified that his employment by Brunt was that of a trucker, and that he hauled iron on a commission ·or contract; that Benton was at the junk yard when he arrived on Monday morning, and Benton was then engaged with a sledge hammer in breaking the compressor, and that he (Brown) had no conversation with Benton.

The trial court made a finding—

"That the defendants converted the property of the plaintiff to their own use knowing at the time it was stolen property, to wit: One compressor and motor."

The court gave ·judgment for plaintiff for $595, which it itemized thus:

"$95 actual damages; $100 for loss of use of the property involved in said litigation, and $400 punitive damages."

Brunt appeals, first directing our attention to the total want of evidence to prove a demand for the return of the property, and that some evidence of such demand and refusal is requisite to establish a cause of action for tortious conversion of personal property.

The rule contended for is sound, but it does not apply where a defendant has gotten possession of stolen goods knowing them to have been stolen. (65 C. J. 42-46, and notes.) He thereby becomes virtually *particeps criminis* with the thief, an accessory after the fact; and certainly no demand is necessary to perfect a cause of action in trover and conversion against the thief himself. Of course, in the case at bar Brunt in his testimony denied that the thief had told him the stuff was "hot" at the time of the sale, but that question of disputed fact was resolved against him by the trial court. Moreover, the ordinary rule which declares that a demand for the return of property is a prerequisite to maintain an action for conversion does not apply when it would be unavailing, and, of course, the return of the compressor which had been broken to pieces with a sledge hammer would have served no purpose of plaintiff.

It is next urged that the correct measure of actual damages was not applied—that the compressor had been reduced to junk before Brunt bought it. True, but the thief testified that Brown, defendant's trucker, had helped to smash it, and the trial court saw fit to believe that testimony notwithstanding Brown's testimony to the contrary. Defendant also calls attention to the testimony upon which the trial court based its finding of actual damages at $95. He points out that the only evidence to support that finding was given by the man who had sold it to plaintiff 2 years, 3 months, and 22 days before it was stolen, and that this witness had not seen the property since he sold it, and that he merely assumed that with ordinary wear and tear it would be worth $95, "a year and a half" after he had sold it to plaintiff. It is also argued that the trial court should have applied the ordinary rule that the measure of damages of personal property is its value at the time of the conversion, and that its conversion by Brunt should not be construed to have been committed when it was stolen, but only as of the time and according to its condition when defendant purchased it. However, the court holds that since plaintiff himself had testified its replacement value was $125 when stolen—and his evidence was competent (*Brenneisen v. Phillips,* 142 Kan. 98, 45 P. 2d 867; *State v. Inverarity,* 150 Kan. 160, 92 P. 2d 45)—the trial court's allowance of $95 as actual damages should not be disturbed.

The next error urged is on the allowance of $100 for loss of the use of the machine. This point is measurably good. Conceding with some doubt that there was competent and substantial evidence that the loss of its use was $5 per day, there was no basis for computing such daily loss for a period of 20 days. If 20 days, why not 40 days, or 278 days?—which was the interval between the theft of the property and the commencement of this action. A tolerant scrutiny of the record may reveal some evidence to justify an allowance of $5 per day for the interval between defendant's illegal acquisition of the property and the time he agreed to hold it subject to the order of the police department, which was 5 days; consequently the allowance for the loss of its use should not exceed $25. Thus limited, a majority of this court approves such allowance.

Defendant's next objection is directed to the allowance of punitive damages. This point presents no difficulty whatever. Since the trial court chose to believe the testimony of the thief that at the time he sold the machine to defendant he informed the latter that it was stolen property, defendant, on peril of both criminal and civil penalties for knowingly receiving stolen property, should have declined to buy it or have anything to do with it. Such was the minimum of his duty as an honest man and good citizen. Failing grossly in that respect, we think the case was eminently one for the allowance of punitive damages. In the early case of *Albert Wiley v. Keokuk*, 6 Kan. 94, the trial court's instructions touching an allowance of punitive damages were presented for review. The questioned instructions read:

"7th.—'Whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, the law allows the jury to give what is called exemplary or vindictive damages.' 8th.—'In cases of torts, and actions for false imprisonment, the jury are the only proper judges of how much the plaintiff ought to recover.' " (p. 106.)

In approving the rules of law thus given by the trial court, Mr. Chief Justice Kingman's opinion, rendered 73 years ago, is well worth repetition:

"These instructions raise the question, so much discussed of late by writers upon law, as to whether such damages as are called exemplary, vindictive or punitive ought ever to be allowed. We content ourselves with following the current of authorities, and decide that the instructions go no further than such authorities warrant. If the law is wrong, let the law-making power correct it. The rule as laid down by the court below has already received the sanction of this court.—*Malone v. Murphy*, 2 Kas., 250. The whole subject is discussed *pro* and *con*, and the authorities referred to, in 2 Greenleaf's Ev., § 253, and

note, and §§ 254, 255; and Sedg. on Damages, 4th Ed., p. 533, and note. And after all this discussion, the Supreme Court of the U. S. decide the law as laid down in these instructions. Mr. Justice Grier, delivering the opinion of the court [in *Day v. Woodworth et al.*, 13 How. 362, 371] well says: 'If repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument. By the common as well as by statute law, men are often punished for aggravated misconduct, or lawless acts, by means of a civil action, and the damages inflicted by way of penalty or punishment, given to the party injured.' We have no doubt that such is the law. Whether it be founded in sound reason or not, is not so much our province to say, as to determine if it be law. The writer hereof believes it to be not only good law, but founded on sound principles, and beneficial in its application. It often furnishes the only restraint upon a bad man, who cares little for his neighbor's character, his person, or his property. The party injured pursues the wrongdoer to punishment, when society is too careless to do so." (p. 106.)

In the recent case of *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 133 P. 2d 149, where among other matters involved in the seizure of mortgaged chattel property in a motor sales warehouse, and where the appellant also forcibly seized a mass of accessories, notes, accounts and other chattels belonging to appellee on which appellant had no claim whatever, the appellee recovered his actual damages in the sum of $10,435.85 and punitive damages in the sum of $8,000. We sustained in principle the allowance of punitive damages because of the flagrant invasion of appellee's rights, although we ordered a remittitur of $4,000 thereon.

Our reports furnish many examples where exemplary or punitive damages have been sustained, as in a case of trespass and intimidation by cattle drovers (*Hefley v. Baker*, 19 Kan. 9) ; in a case of false imprisonment (*Wheeler & Wilson Mfg. Co. v. Boyce*, 36 Kan. 350, 13 Pac. 609) ; where a passenger was wantonly expelled from a railway train (*S. K. Rly. Co. v. Rice*, 38 Kan. 398, 16 Pac. 817) ; where plaintiff was swindled in a fraudulent sale of worthless stock (*Roseberry v. Scott*, 120 Kan. 576, 244 Pac. 1063) ; and where a barber's business was ruined by defendants' oppressive conduct under pretense of official action (*Stoner v. Wilson*, 140 Kan. 383, 36 P. 2d 999). See, also, *Wilson v. Vaughn*, 23 Fed. 229; and *American Co. v. Hicks*, 65 Colo. 146, 172 Pac. 1055, L. R. A. 1918 F. 302.

Underlying these cases and a wide variety of others which might readily be cited, the allowance of punitive damages in addition to actual damages was held to be justified because of some aggravated misconduct or willfully lawless act of the wrongdoer against the party injured. The acquisition of a stolen chattel by one who had

been informed that it had been stolen is certainly all the justification needed under the age-old rule stated by Mr. Chief Justice Kingman in *Albert Wiley v. Keokuk*, supra, to sustain an allowance for punitive damages in an action of trover and conversion by the injured party.

In Bowers' Law of Conversion, section 252, it is said:

"It is but a reiteration here to say that in the sale of goods a purchaser must look to his title, and if he obtains them from one who is neither the owner nor his authorized agent, he gets no title maintainable against the true owner. Upon this principle, if the goods have been stolen the property in them does not pass by delivery (unless, indeed, they be instruments in form negotiable) and a person who derives his title from or through the thief gains no rights as against the lawful owner, and if he either refuses upon the demand to give them up, or sells them and turns them into money, or otherwise converts them to his own use, he is liable to the lawful owner in trover. This doctrine has its foundation in public policy which admonishes purchasers thereby to be more cautious in the purchases they make and not by their zeal for cheap bargains to offer encouragement to thieves, who, if the loose habit of purchasers to buy everything offered for sale should no longer obtain, would find less profit in plying their avocation. Every vendee should have good reason to believe that his vendor has lawful authority to sell, and failing in this, it is no more of a hardship to hold him liable than it is to make the innocent owner lose his property."

See, also, 15 Am. Jur. §§ 326, 355, 367; 25 C. J. S. 705-709; 26 R. C. L. 1137; 4 Sutherland on Damages, 4th ed., § 1131.

The cause will be remanded to the district court with instructions to give plaintiff judgment for $520, and thus modified it will be affirmed. It is so ordered.

DAWSON, C. J. (dissenting) : Perhaps the indisputable facts were sufficient to prove some substantial damages, which would support an additional assessment of punitive damages under the salutary rule laid down by Mr. Chief Justice Kingman. My difficulty is with the specific allowances for actual damages and for loss of profits. If the trial court had chosen to believe plaintiff's testimony as to the replacement value of the stolen property, which was $125, this court could not meddle with it. (*Brenneisen v. Phillips*, 142 Kan. 98, 45 P. 2d 867.) But the trial court rejected that testimony altogether and found its value to be $95, on evidence that was neither competent nor material. The witness who testified to that value had not seen the machine since he sold it about two years and four months before it was stolen. And he merely assumed that

one year and six months after he had sold it (which was almost ten months before it was stolen) it might be worth $95. If defendant had not been under the obloquy of being an alleged "fence for stolen property," as counsel for appellee assured us he was, I do not think the evidence of $95 as actual damages would have been regarded as sufficient to sustain the judgment on that point.

The fact that there was competent evidence of value, $125, to which the trial court gave no credence, cannot justify a valuation of $95 based solely on incompetent and immaterial testimony. (See *Schreiner v. Rothgarn*, 150 Kan. 325, 330, 92 P. 2d 59.)

I cannot assent to any part of the allowance for loss of profits. Given the most generous construction, the $5 per day profit on plaintiff's business "in the summer months" meant his gross profits. Indeed, that was the trial court's interpretation of the evidence when it was being given. The record reads:

"The Court: . . . I haven't heard any testimony yet as to what the profit was in a day. Gross business is one thing. Profit is another."

The later evidence offered by plaintiff did not supply that deficiency. Moreover, plaintiff's testimony merely was that his [gross] profits were about $5 or $6 per day "in the summer months." Both popularly and astronomically, in this latitude, the summer months had passed when plaintiff's compressor was stolen. I therefore dissent.