No. 45,120

Minnie Wilson Augustine, Katherine Goebel and James Wilson Augustine, *Appellees,* v. Ralph L. Hinnen, James E. Hinnen, Allen H. Poe and R. P. Baker, *Appellants.*

(443 P. 2d 354)

Opinion filed July 13, 1968.

*J. B. McKay* and *James B. McKay, Jr.,* both of El Dorado, argued the cause and where on the brief for the appellants.

*O. J. Connell, Jr.,* of El Dorado, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

Price, C. J.: This was an action to recover actual and punitive damages for the alleged pollution of fresh water wells on plaintiffs' land by defendant oil and gas leasehold owners and operators.

A jury awarded both actual and punitive damages, and judgment was entered on the verdict. Defendants have appealed.

For many years plaintiffs and their immediate ancestors had owned the 200 acres in question and had carried on successful farming and cattle operations.

In August 1955 defendants acquired from Vickers Petroleum Co. certain oil and gas leases on land adjacent to that of plaintiffs. Vickers had been disposing of the salt water produced from the leases by either storing it in ponds or running it through a pipeline into the Whitewater River. After acquiring the leases from Vickers, defendants, from 1956 to 1960, under permits issued by the State Corporation Commission, installed salt water disposal wells and no longer used the storage ponds. The pipeline into the river was used only in rare emergency situations up until 1961.

In 1959 defendants' leases were producing 750 barrels of salt water daily—all of which, from 1961 on—was disposed of underground. From time to time tests were made by the State Board of Health of plaintiffs' fresh water supply and they showed rapidly increasing salt content. In the meantime, defendants had installed a "braden head" on the casing in one of their salt water disposal wells (McCraner B-2) so as to prevent salt water from any leaks in the innermost pipe from coming to the surface.

Be that as it may—matters with respect to plaintiffs' farming and cattle operations became progressively worse due to the extremely high salt content in their fresh water supply—finally coming to a head in the fall of 1962. On December 1, 1962, defendants sold the leases in question.

This action was filed on March 17, 1964. The petition sought actual damages in the amount of $30,000.00 and punitive damages in the amount of $20,000.00. At pretrial hearings plaintiffs elected to pursue their case on the theory of temporary damages for the two-year period beginning in the fall of 1962. It was ordered that the questions of fact for determination were (1) whether defendants allowed the escape of deleterious substances to the damage of plaintiffs, (2) whether the escape was within the time provided by the statute of limitations, (3) was the escape beyond the control of defendants as provided by K. S. A. 55-121, and (4) the amount of actual and punitive damages, if any.

Following a lengthy trial the jury returned a verdict for plaintiffs for $12,651.55 actual damages and $18,000.00 punitive damages.

In this appeal defendants allege 15 grounds for reversal, among which are questions concerning instructions given and refused, the statute of limitations, the size of the verdict, alleged passion and prejudice of the jury, and the sufficiency of the evidence to support the verdict as to both actual and punitive damages.

In the instruction concerning the two-year statute of limitations the jury was told that the cause of action did not arise until plaintiffs were injured by the discharge of salt water, and that if their injury occurred more than two years prior to the date of filing suit they could not recover. We see nothing wrong with the instruction (*Gardenhire v. Sinclair—Prairie Oil Co.*, 141 Kan. 865, Syl. 1, 44 P. 2d 280; *McComb v. Stanolind Oil and Gas Co.*, 164 Kan. 1, 7, 186 P. 2d 574.) And see K. S. A. 60-513 in which it is stated that a cause of action under such section shall not be deemed to have accrued until the act giving rise to such cause of action first causes substantial injury.

And on the question of "temporary-permanent" damages—neither do we believe the jury was misdirected when instructed as to what items of damage it was entitled to consider.

Nothing would be gained by narrating in detail the voluminous evidence with respect to the cause of this salt water pollution or the resulting damage and injury to plaintiffs. It is sufficient to say that we have carefully examined the record and it fully supports the proposition that salt water had escaped from a hole in the pipe in the McCraner B-2 disposal well about 40 feet below the surface, resulting in the pollution of plaintiffs' fresh water wells.

As stated—the jury returned a verdict of $12,651.55 for actual damages. It is contended such amount is greatly in excess of what is shown by the evidence. In so contending, however, defendants concede plaintiffs' evidence enumerated specific items of damage totaling $5,905.00. Those items will not be mentioned in detail. They do not, however, include injury to cattle—and the loss of a "calf crop"—concerning which there was much evidence—although no specific "dollars and cents" figures were mentioned. And neither did those items include the rental value of pasture shown to be $17.00 to $20.00 per acre annually. In *Albin v. Munsell*, 189 Kan. 304, 369 P. 2d 323, it was said—

"The fact that the damages disclosed by the evidence cannot be calculated with absolute mathematical or financial exactness does not render them so uncertain as to preclude their assessment." (p. 312.)

And so here. The mere fact that plaintiffs' evidence did not place an exact dollar amount on some of their damage and injury did not preclude the jury—under proper instructions—from considering it.

Considering the entire situation disclosed by the record—we cannot say that the verdict for actual damages is not within the range of and is unsupported by the evidence.

This brings us to the question of the $18,000.00 verdict for punitive damages which defendants contend is wholly unsupported by the evidence.

In the recent case of *Atkinson v. Herington Cattle Co., Inc.*, 200 Kan. 298, 310, 311, 312, 436 P. 2d 816, which was an action to recover damages for the pollution of a dairy farm water supply by runoff from cattle feed-lots, rules relating to the allowance of punitive damages were discussed. Generally speaking, they are allowable not because of any special merit in a plaintiff's case, but are imposed by way of punishing a defendant for malicious, vindictive or a willful and wanton invasion of a plaintiff's rights—the purpose being to restrain him and deter others from the commission of like wrongs. It often has been said that punitive damages are allowable when a defendant's conduct has been such as to show a reckless indifference and disregard of the rights of others. The mere fact—if it be a fact—that defendants here may have violated the provisions of K. S. A. 55-121 relating to the escape of salt water —thus subjecting them to criminal prosecution (55-122)—is not of itself sufficient to support an award of punitive damages (*Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 523, 524, Syl. 5, 106 P. 2d 652; *Watkins v. Layton*, 182 Kan. 702, 707, 324 P. 2d 130). Something more is required—such as the intentional doing of a wrongful act with full knowledge and realization of its character without cause or excuse.

Plaintiffs make some point of the fact the evidence tends to show that defendants' application to the State Corporation Commission to convert the McCraner B-2 to a disposal well contained inaccurate information as to the presence and depth of pipe then in the hole. Conceding such to be the fact—we think it falls short of bringing the matter within the rules relating to the allowance of punitive damages.

Considering the totality of the entire situation disclosed by the record—we find a complete absence of evidence to establish that defendants' conduct throughout their operations was willful, malicious or wanton, or that it showed a reckless indifference and disregard of the rights of plaintiffs. Accordingly—the verdict and judgment for punitive damages cannot stand.

Other matters discussed by the parties have not been ignored, but are considered either to be without substantial merit or, in view of the decision reached, immaterial.

With respect to actual damages the judgment is affirmed. With respect to punitive damages the judgment is reversed with directions to set it aside.

SCHROEDER, J., dissenting: In my opinion the evidence presented by the record in the instant case is sufficient to warrant a verdict for punitive damages, and I must respectfully dissent from this portion of the court's opinion.

The law does not require a specific finding of an intentional and ruthless desire to injure in order to sustain an award of punitive damages. The burden of proof is sustained, once the injured party shows such gross neglect of duty by the wrongdoer as to evince reckless indifferences of the rights of others. (*Watkins v. Layton,* 182 Kan. 702, 324 P. 2d 130.)

The fact that the act on which an action is based is unlawful and subjects a person to criminal prosecution does not of itself authorize the recovery of exemplary damages, but generally the intentional doing of a wrongful act with full knowledge of its character and without cause or excuse, is malicious and warrants an award of exemplary damages. (*Donley v. Amerada Petroleum Corp.,* 152 Kan. 518, 106 P. 2d 652; *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P. 2d 270; *Hammargren v. Montgomery Ward & Co.,* 172 Kan. 484, 241 P. 2d 1192; and *Watkins v. Layton,* supra.) It has been said that malice upon which to sustain exemplary damages can be implied from such conduct. (*Glass v. Brunt,* 157 Kan. 27, 138 P. 2d 453.)

The record discloses that the oil operations conducted by the defendants were located on leases north and west of the plaintiffs' property. The flow of ground water beneath the surface was such that salt water escaping from the defendants' operations would flow in the direction of the plaintiffs' land. The evidence established that the plaintiffs' ground water was polluted with chloride to such an extent that it was unsuitable for use by humans or in agricultural pursuits.

In July, 1962, during cultivation on the plaintiffs' property, water was noticed seeping on the surface between the two houses thereon; in October when harvesting the area, a large area of standing water had the appearance of salt crystals; it was tasted and found to be salty, and the Board of Health was notified. Previously water had been observed escaping from the hole of an old well across the road to the north and 500 feet west of the area where the water

had been seen standing. Later the defendant, R. P. Baker, who was one of the owners and the operator of the lease on which the old well was located, was observed working on the area. Another witness saw what appeared to be salt crystals in the area of the break-out well.

The defendants' disposal well, McCraner B-2, was tested and found to have a leak in the pipe 40 feet below the surface, and there was expert testimony from which a jury was entitled to find that this disposal well was the primary source or contributed to the pollution of the plaintiffs' water wells.

A geologist for the State Board of Health testified that any fluids going through a leak in a pipe in the McCraner B-2 disposal well would go down the bore wall into the ground water table. (The largest fresh water-bearing strata was approximately 60 feet below the surface.)

The McCraner B-2 disposal well was completed by the defendants in the latter part of 1956 under a permit issued by the Kansas State Corporation Commission. Upon the defendants' theory of the case this disposal well could not have contributed to the pollution of the plaintiffs' water.

They sought to establish that this was an old well containing 7-inch pipe and 15½-inch casing in the hole, and to convert it into a disposal well under such permit the defendants at their expense ran 110 feet of 8⅝-inch casing around the 7-inch pipe; that the 60 to 90 feet of such 15½-inch casing was around both. They sought to show that they then cemented between the 8⅝-inch casing and the 15½-inch casing, and tied the 7-inch and 8⅝-inch casing together at the top of the hole by welding a plate across them which is known as a "braden head" to prevent any water which might escape through the 7-inch pipe from coming to the surface of the land.

Their theory was that any salt water escaping from the 7-inch pipe was sealed out of the fresh ground water strata, because the pipe was cemented below such level.

There was expert testimony that the best evidence of a poor cement job was a leak.

The defendants contend they had no knowledge of any leak in the McCraner B-2 disposal well until they were advised of the results of a flag test; hence, they were not liable for punitive damages.

While the defendants rely upon positive evidence given by their expert witnesses concerning the McCraner B-2 disposal well, it is to be noted their testimony was premised upon the fact they gained their information by looking "at logs concerning old wells."

At the time the McCraner B-2 well was converted to a disposal well, R. P. Baker, a party defendant to this action and an owner and *operator* of the lease in question, testified on cross-examination that:

"He has no positive knowledge that the 15½ inch casing was still in the hole when the McCraner B-2 was converted into a disposal well. The application to the corporation commission to convert the McCraner B-2 to a disposal well stated there was 62 feet of 15½ inch pipe and 130 feet of 8⅝ inch pipe, when actually he didn't know whether the 15½ inch pipe was still there and actually ran 110 feet of 8⅝ inch pipe."

Where a party to a lawsuit makes admissions in his testimony, while a witness in the case, such admissions are binding and conclusive if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross-examination of the party. (*Hiniger v. Judy,* 194 Kan. 155, 398 P. 2d 305, Syl. ¶ 2; *Reeder v. Guaranteed Foods, Inc.,* 194 Kan. 386, 393, 399 P. 2d 822; *Bellport v. Harder,* 196 Kan. 294, 411 P. 2d 725; and *Schoof v. Byrd,* 197 Kan. 38, 415 P. 2d 384.)

With the foregoing admissions of Baker in the record, the "positive" evidence relied upon by the defendants falls of its own weight, and the jury was entitled to discredit the theory of the defendants as to the installations made in establishing the McCraner B-2 well as a disposal well.

Under these circumstances the jury would be justified in finding that the installation of the "braden head," which would prevent detection of any salt water entering the fresh water strata through a leak in the 7-inch casing, was calculated and purposely designed to conceal from the landowners and the State Board of Health the pollution of the fresh water strata through a leak in the 7-inch pipe. Had the "braden head" not been installed, the appearance of salt water at the surface would have been a warning to all concerned that too much salt water was being forced into the defective disposal well, and if it had been flowing to the surface, it certainly would have been flowing through any leaks that existed near the surface in the 7-inch pipe.

The evidence confirms that salt water was being forced to the surface from an *open well* checked by a geologist from the Depart-

ment of Health on the 19th day of April, 1963, the surface of which was 15 to 20 feet lower than the McCraner B-2 well. Another *open well* in the vicinity was checked but no water was found flowing from it.

It is noted the order of the Corporation Commission gave the defendants permission to inject only 500 barrels of salt water per day in the McCraner B-2 disposal well, whereas in 1959 a maximum of 750 barrels of salt water were produced per day from the defendants' leases in question, all of which was disposed of underground after 1961. There were three other disposal wells on the defendants' leases, but the evidence is barren as to how much salt water was disposed of through these wells, one not having been used for eighteen months, and it had a leak 20 feet from the surface.

Under K. S. A. 55-121, it is made unlawful for any person having possession or control of any well (oil and gas wells) drilled, to permit salt water from any such well to escape by overflow from the vicinity of such well. It is further made the duty of such person to keep such salt water safely confined so as to prevent the escape thereof.

K. S. A. 55-122 makes any person who knowingly or willfully violates 55-121, *supra,* guilty of a misdemeanor punishable by a fine of not exceeding $1,000 or by imprisonment not exceeding one year, or by both.

K. S. A. 55-118 provides:

"If any well or other excavation be put down to or through any vein or strata containing salt water or water containing any minerals in appreciable quantities, it shall be the duty of the owner or operator, driller or person putting down such well or excavation to case or plug such well or excavation in such manner as to exclude all salt water or water containing minerals in appreciable quantities from both upper and lower veins or strata holding water suitable for domestic purposes."

The provisions of K. S. A. 55-120 make violation of the foregoing statute a misdemeanor punishable by fine of not more than $1,000.

The extent of the pollution of the plaintiffs' fresh water supply is indicated by a test made of the water in the well located near the plaintiffs' barn in September, 1965, which indicated 33,200 parts per million chloride. Salt water flowing on the surface from the open well across the road, a sample of which was taken April 19, 1963, and tested, showed 77,000 parts per million chloride. There was expert testimony that water containing more than 5,000 parts per million chloride was unsuitable for livestock.

The evidence indicates it was not until salt water had flowed from an open well on the defendants' lease for a sufficient length of time to form a body of water on the plaintiffs' land, and a subsequent report to the State Board of Health by the plaintiffs, that any activity was noted on the defendants' part to prevent pollution of the plaintiffs' water.

In my opinion the presence of open wells on a lease from one of which salt water flows on the surface, in view of the foregoing statutes, is sufficient notice to call for immediate action on the part of the owners of the lease. Any delay in action on their part thereafter is sufficient to evince a reckless indifference of the rights of others, thus authorizing the allowance of punitive damages. Even confining the evidence in the instant case to the McCraner B-2 disposal well, it is sufficient to warrant a finding by the jury that the defendants evinced a reckless indifference of the rights of others, thereby warranting an award of punitive damages by the jury.

Further consideration of the numerous points raised by the defendants in their brief challenging the award of punitive damages is unwarranted herein, inasmuch as their consideration would be purely academic.

It is respectfully submitted the evidence disclosed by the record in this case warranted the submission of the case to the jury for the allowance of punitive damages, and the further questions presented by the appeal should have been considered and determined by the court.

FATZER, J., joins in the foregoing dissenting opinion.