No. 20,603.

J. M. IVEY, *Appellee*, v. THE UNION PACIFIC RAILROAD COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. RAILROADS—*Personal Injuries—Action for Damages—Finding of Jury Precludes Recovery.* The action was one for damages by a member of a railway switching crew for personal injuries inflicted by the movement of a freight car while he was between the rails of the track adjusting the car's automatic coupling device, a duty which he was required to perform. The petition alleged that the plaintiff's associates knew, or ought to have known, of his situation. The court instructed the jury that recovery depended on such knowledge, actual or imputed. The jury found specially that no member of the switching crew, other than the plaintiff, had reasonable cause to believe he was in a position of danger when the car at which he was working was moved. *Held,* the instruction was material and was correct, and the finding precluded recovery.

2. SAME—*Finding of Jury—Acquits Defendant of Negligence Pleaded.* In answer to a request to state in what the negligence of the defendant consisted, the jury stated an omission not complained of, not submitted to the jury as a basis of recovery, and which, under the finding already referred to, was not an actionable omission. *Held,* the answer acquitted the defendant of the negligence pleaded and precluded recovery.

Appeal from Saline district court; DALLAS GROVER, judge. Opinion filed January 6, 1917. Reversed.

*R. W. Blair, C. A. Magaw,* and *T. M. Lillard,* all of Topeka, for the appellant.

*Frank L. Martin, Van M. Martin,* and *John M. Martin,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a member of a railway switching crew for damages for personal injuries inflicted by the movement of a freight car while he was between the rails of the track adjusting the car's automatic coupling device. The plaintiff recovered and the defendant appeals.

The coupler was at the east end of the car. The car was the east one of three empties detached from a freight train

which was to be broken up in the Salina yards. These cars stood on what was called the passing track. The remainder of the train, consisting of thirty-one cars, stood on the first track north of the passing track, called the back track. The two tracks were connected by a cross-over which lay between the two parts of the train. The east car of the main portion of the train was four or five car lengths west of the nearest car of the other portion. A switch engine was attached to the west end of the main string. The switching crew consisted of John Anken, who was foreman, Harry Lennon and the plaintiff, who were switchmen, and the engineer and fireman. The entire train was to be moved eastward about a quarter of a mile, where a track called track No. 5 was to be utilized in breaking up the train. With the train in this situation, the foreman and switchmen were in the vicinity of the cross-over. The foreman directed the plaintiff to go on east and line up the switches, five in number, for track No. 5. The plaintiff started to do this, and the foreman walked along behind him, marking the detached cars on the passing track with chalk to show where they were to be set. Each man carried a lantern. They were both on the north side of the detached cars, and before the plaintiff reached the east end of the east car, the foreman completed his marking and turned back toward the west. The plaintiff went on, and went around the east end of the car to examine the knuckle and see if it would couple by impact. It was a part of his duty to do this. He found the knuckle closed, and went to the southeast corner of the car to open the knuckle with the lever provided for that purpose. The lever did not operate the knuckle, and he went between the rails to adjust it with his hands. While there the main portion of the train struck the empty cars and the plaintiff was knocked down. The two parts of the train did not couple, and the three empty cars passed over him and injured him.

The charge of negligence contained in the petition reads as follows:

"That the defendant, . . . while plaintiff was still in front of and at the east end of said east box car, did carelessly, negligently, recklessly and wantonly by the said switch engine, push, switch and propel with great speed, force and violence, said string of box cars upon the back track eastward and over and across the switch and into

the west end of the three box cars standing upon the side track where plaintiff was at work, without any warning or notice to the plaintiff and without any signal from plaintiff and when said defendant, The Union Pacific Railroad Company, its agents, servants and employees, and the defendants, John Anken, Wm. Tozier, M. P. Weis and Harry Lennon knew, or in the exercise of ordinary care ought to have known that plaintiff was at the east end and in front of said box cars upon the said side track."

The petition referred to a certain car as blocking signals from the foreman and switchmen to the engineer, but there is nothing in the record to indicate that the position of the car had anything whatever to do with the accident.

The evidence was that the engineer was on the north side of his engine. It was Lennon's duty to keep in sight of the engineer, and he had been left near the east end of the main string of cars, and on the north side of them, to transmit signals to the engineer. He did give the back-up signal to the engineer which caused the main portion of the train to be moved. Whether he merely transmitted a signal given him, or signaled the engineer on his own authority, was a disputed question. The foreman and Lennon testified that the plaintiff himself gave the signal to back up. The plaintiff testified he gave no signal, that it was not his duty to give a back-up signal or other signal for the engineer, and that his duty was to line up the switches, and then signal the foreman he had done so. Lennon testified as follows:

"It wasn't our duty to stand still and not move toward track No. 5 until after Ivey had traveled the 1200 feet and lined up the switches. I never heard of any practice where a crew was to stand still and wait for a man to go 1200 feet on an occasion of that kind to line up switches."

Lennon testified that after the plaintiff gave the back-up signal, he disappeared around the end of the car. The foreman, having his back toward the plaintiff at the time, did not see him go around the end of the car. After he had gone around the end of the car, while he was examining the coupler, trying to work the coupler with the lever, and then adjusting the coupler with his hands, he could not be seen by any of his associates. Knuckles ordinarily open when the lever is jerked. The purpose of the lever is to enable the switchman to stand outside the rails and throw the knuckle open. The plaintiff did not know that he would need to stand

between the rails until he had gone out into the clear, had tried the lever, and had discovered that it did not open the knuckle. When the lever failed to work, all the plaintiff had to do was to reach in, pull up the safety lock and open the coupler, a work requiring but fifteen or twenty seconds of time. A number of witnesses testified to the following effect:

"According to the usual practice and the rules and custom in switching, if a man found that any work required his presence between the rails up near a car that might be moved he should step out in sight of the engineer or man whose duty it was to pass signals to the engineer and give him a signal to stop. If the engineer was already stopped he would give this signal anyway and it would mean to stay stopped."

One of the witnesses said:

"I do not mean to tell the jury that every time a switchman saw a coupling closed he would have to signal the engineer to stop when he wasn't going at all."

The plaintiff did not dispute this practice when called in rebuttal. The foreman testified that after he left the plaintiff and started west, he was looking over his switch list, and took his time. He was going to the west end of the detached empties to see if the cars coupled. If they did not, he would then see that the coupling was made. Had he reached the place, he would have given a slow signal. There was conflicting evidence relating to the speed of the main portion of the train when it struck the detached cars.

The court stated to the jury the claim of negligence substantially in the language of the petition, and advised the jury that if they found the facts as the petition alleged them to be the verdict should be for the plaintiff. Besides instructing with reference to contributory negligence and assumed risk, the court instructed the jury as follows:

"The jury are instructed that your verdict must be for the defendant unless you find from the evidence that some of the members of the switching crew knew or had reasonable cause to believe that the plaintiff was in a position of danger when the engine and the cars attached to it were switched into the three detached cars."

The jury returned the following special findings of fact:

"1. Did defendant, through its engineer and fireman, Wm. Tozier and M. P. Weis, push the string of box cars eastward and into the west end of the three cars standing upon the sidetrack at a dangerous rate of speed. A. Yes.

Ivey v. Railroad Co.

"2. Did the defendant's engineer and fireman push and back said string of box cars eastward and into the west end of the three cars standing upon the sidetrack, without any notice or warning having been given to plaintiff.   A.  Yes.

"3. Did the defendant's engineer and fireman push the string of box cars eastward and into the west end of the three cars standing upon the side track without any signal from the plaintiff to do so?   A.  Yes.

"4. Did the defendant's engineer and fireman push the train of cars eastward to a connection with the west end of the three cars on the side track without a slow signal from the foreman?   A.  Yes.

"5. Was the switch foreman Anken in the proper place for the performance of his duty when the coupling was made?   A.  No.

"6. If you answer the preceding question 'No,' state whether if the said Anken had been in his place of duty when coupling was made would he in the exercise of reasonable care have discovered that Ivey was adjusting coupling in time to warn him of danger?   A.  To some extent.

"7. Was the defendant guilty of any negligence causing the plaintiff's injury?   A.  Yes.

"8. If you answer the preceding question 'Yes,' then state fully of what the defendant's negligence consisted.   A.  The defendant was negligent inasmuch as he was not at his post of duty to give slow signal when coupling was made.

"9. If you answer question No. 7 'Yes,' then state what employee of defendant was guilty of such negligence.   A.  Mr. Anken and Mr. Lennon.

"10. Did any member of the switching crew other than Ivey have any reasonable cause to believe that he was in a position of danger when the main string of cars was backed to couple with the three detached cars?   A.  No.

"11. Did the engineer back up his train in response to a back-up signal given by one of the switchmen?   A.  Yes.

"12. What was the distance from the place where the three detached cars were standing on the passing-track to the last switch Ivey was directed to open in order to set the cars on track five?   A.  1,000 or 1,200 feet.

"13. How many switches was Ivey required to line up in order to set the cars on track five?   A.  Five.

"14. Was it required by the rules or the practices of the switching crew that the main string of cars should not be coupled onto the three detached cars until Ivey had lined up all the switches leading to track five?   A.  No."

The defendant moved for judgment in its favor on the special findings, and the refusal of the court to render such judgment is assigned as error.

The special findings of fact acquitted the defendant of the

negligence charged in the petition, and undertook to base liability on an omission which was not complained of, which was not submitted to the jury as a basis of recovery, and which, under finding No. 10, was not an actionable omission. The negligence charged in the petition was excessive speed and violence in making the coupling, without notice or warning to the plaintiff, and without signal from him, while he was at the end of the car performing a duty. The plaintiff testified, and testified again, that his duty in respect to giving signals consisted in signaling Anken that the switches were lined up, when the switches were lined up, and so excluded any duty on the part of Anken or Lennon to expect a signal from him before that time. He gave no stop signal indicating that he desired to work between the rails. Unless the plaintiff's associates knew or ought to have known that he would be endangered by the coupling, they had no reason to give him notice or warning, and had no reason to moderate the speed or force attending the coupling, so far as he was concerned. They could ignore him and handle the train as they pleased without being guilty of negligence toward him, unless they ought to have anticipated danger to him. The petition was drawn on this theory. It was alleged that the plaintiff's associates knew, or ought to have known, that the plaintiff was at the end of the car when the coupling was made. This allegation was inserted because no duty to him to await his signal or to warn him or to handle the train gently arose, unless they knew, or ought to have known, his situation. This is elementary law, and the court so instructed the jury, as it was bound to do. The jury were unable to say from the evidence that the plaintiff's associates had any reasonable cause to believe that he was in a position of danger when the train was backed to make the coupling, and consequently returned the tenth finding of fact. The finding is well sustained by the evidence. When catechised with reference to who of the plaintiff's associates was guilty of negligence, the jury named Anken and Lennon, in finding No. 9. This acquitted the engineer of negligence. He did not and could not know where the plaintiff was or what he was doing. The engineer simply obeyed Lennon's signal, put the train in motion, and imparted to it whatever speed or force it had when

Ivey v. Railroad Co.

the coupling was attempted. When asked to state in what the negligence of the defendant consisted, the jury did not say that the plaintiff's associates should have waited for a signal from him, or that they should have warned him, or that the main body of the train bore down on the three cars with too great speed or violence. The jury said in finding No. 8: "He was not at his post of duty to give slow signal when coupling was made." When asked who was guilty of "such negligence," that is, who ought to have been at his post of duty to signal the engineer to slow down the train to make the coupling, the jury included Lennon with Anken. The jury got this supposed negligence from Anken's testimony recited above, and not from the petition or from the court's instructions. Had a charge of negligence of this kind been included in the petition, submitted to the jury and sustained by evidence, it would not have afforded a basis for the general verdict because of finding No. 10. Unless Anken and Lennon had reasonable cause to believe that the plaintiff would be imperiled if they did not give a slow signal, no occasion existed for doing so.

The sixth finding does not answer the question propounded and must be ignored. It was evidently phrased to avoid giving a truthful answer according to the evidence. The plaintiff's evidence was positive and unequivocal that he was entirely out of sight of the other members of the switching crew. Other testimony was to the same effect. There was no testimony or circumstantial evidence to the contrary. The plaintiff himself said Lennon was at the place where it was his duty to stand and wait for signals. Because of the curve of the cross-over, the engineer could not see him or receive signals from him if he went nearer the empty cars on the south track. If the foreman had reached a position near the west end of the west car of the three empties, he would have watched the approach of the main string of cars from the west and north and would have given a slow signal to Lennon to be transmitted to the engineer. His attention would have been taken with these things and would not have been attracted in the plaintiff's direction. But if he had looked toward the east he could not have seen the plaintiff at all. The plaintiff testified as follows:

"Q. When you first went around and saw that knuckle you then for the first time discovered that it needed opening, did n't you? A. Yes, sir.

"Q. And then you went out in safety in the clear and pulled on the lever and failed to open it? A. Yes, sir.

"Q. And not until you had done that did you yourself know that you were going to be in a position of danger, did you? A. No, sir.

"Q. And those men in the switching crew besides yourself were where they could n't see what you were doing at all, were n't they? A. I did n't understand that question.

"Question read. A. Yes, sir.

"Q. Tozier and Weis were away up in the engine? A. Yes, sir.

"Q. Thirty car lengths away or more? A. Yes, sir.

"Q. Lennon was up around on the point of the curve, wasn't he? A. I think he was up at Santa Fe Avenue.

"Q. Anyway he was away where he could n't see you? A. Yes, sir.

"Q. And Anken was also upon the other side of the car so he couldn't see you? A. Yes, sir."

Since the jury evaded returning a candid answer and refused to say whether or not Anken would have discovered what the plaintiff was doing, the answer returned is nugatory.

None of the remaining findings qualifies findings Nos. 8, 9, and 10. The plaintiff argues that the quoted instruction was immaterial, that the jury could disregard it, and that this court should disregard it. The court does not regard the argument as sound, for reasons already stated. The plaintiff also undertakes to harmonize the findings of fact with the general verdict. It would unduly extend this opinion to meet the skillful argument in detail. The court regards findings Nos. 8, 9, and 10 as irreconcilable with the general verdict, and under the statute they control.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for the defendant on the special findings of fact.