Hillsborough, } No. 3103.
Oct. 3, 1939. }

NELLIE GELINAS *v.* J. J. NEWBERRY CO.

*Laflamme & Nourie* and *Paul J. Doyle* (*Mr. Doyle* orally), for the plaintiff.

*Devine & Tobin* (*Mr. Tobin* orally), for the defendant.

PAGE, J. The defendant has waived all exceptions other than those to the denial of its motions for a nonsuit and a directed verdict.

The defendant employed the plaintiff as a saleswoman in its store. One of the plaintiff's duties was to keep her counter supplied with stock, and in case it were depleted, to go to the stock-room for the necessary supply. The stock-room was in the basement, and the stock-racks were separated by aisles. The room was dark except when in use.

Having occasion to go to the stock-room on June 12, 1936, the plaintiff switched on an electric light in the main aisle near a safe. Shortly beyond this light, to the left, was the branch aisle in which the needed stock was stored. Four lamps were provided for the illumination of this branch aisle, one in the main aisle and three in

the branch aisle. No one of the switch-cords on the first three of the four was long enough to be reached by the plaintiff, and this condition she testified had always existed during the year and a half that she had worked for the defendant.

The plaintiff could not therefore obtain direct illumination for the stock she sought until she reached the fourth and last lamp near the far end of the branch aisle. She entered the aisle. The diffused light from the lamp near the safe was sufficient, according to her story, to permit her to see that there was some object on the floor of the branch aisle. She passed this object safely, reached the lamp at the far end of the aisle, and switched it on.

Having switched on this lamp, she looked back and saw that the object was a box taking up some more than half of the three-foot-wide aisle. She went to the box and examined it, lifted the cover, and found that it contained toy lawn-mowers. It was too heavy for her to lift, so she went back to get her own stock near the fourth or last light, without placing the box of lawn-mowers on a shelf in the rack where it was supposed to be left. She had never before seen a box out of place in the aisle. The defendant, however, knew that the aisles were sometimes thus obstructed and kept more or less constant inspection to avoid it.

Going back near the fourth light, the plaintiff placed the needed stock on a tray which she put on a shelf. Then she switched off the light, picked up the tray and began her return. She tripped over the box and was injured. She blames the lack of lights two and three for her failure to avoid the box. Her duties took her to this place six or more times daily. Her visits during a year and a half had depended upon the same lights, and only the same lights, that she used at the time of the accident. There was also some little light admitted to the far end of the aisle by a glass sidewalk.

At the time that she switched off the light for her return, the plaintiff was five feet from the box. After she had switched off the light, she could still see the box. She could have got by it safely if she had kept further to the left. Her ability to see the box in the diffused light from the lamp near the safe appeared on cross-examination. Later, on redirect examination by her own counsel, she testified as follows:

"Q. Miss Gelinas, after you got your pin-wheels and put them down and then put the light out— A. Yes. Q. —and you started back— A. Yes. Q. —how was the light in the aisle then? Could you see things good? A. It was kind of dark. Q. And whether or not there were any shadows thrown? A. The only shadow was

from that light near the safe. Q. That threw a shadow in the aisle? A. Yes. Q. And could you see things plain? Did you see things easy? Could you see things clear? A. When I was going in? Q. No, after you put the light out, after you got your pin-wheels and put the fourth light out and started back? A. Yes. Q. When the light was out? A. Yes. Q. Could you see things clear and plain then? A. Well, I could see the box. Q. As you came towards the box after you got your pin-wheels in your arms, the light in back of you was put out, didn't you say? A. Yes. Q. There were no lights in the aisle then, were there? A. No. Q. Could you see things plain? I mean clear, the same as when the light was on? A. No."

All of the foregoing testimony and facts are derived from the plaintiff's own mouth. She was so clear and unequivocal in what she said, and her statements are so free from substantial conflict, that the jury were bound to find the facts as stated above. *Harlow v. Leclair*, 82 N. H. 506; *Maltais v. Concord*, 86 N. H. 211.

Before she switched off the light, the plaintiff knew the exact location, weight and size of the obstruction on the floor. She knew the degree of light that would remain in the aisle were the light to be extinguished, for she had just experienced it. She had seen the box dimly before the light was turned on. She would see it again dimly after she extinguished the light. But she now knew all about its position, size and weight, and its exact capacity to obstruct passage. She knew, and had long known, as she testified, that if one tripped over such an obstacle, injuries were possible.

Consequently plaintiff's counsel seems to concede that before extinguishing the light, she had such full knowledge of the danger as would ordinarily charge her with assumption of the risk. Nevertheless it is urged that she did not have full knowledge of the situation when she passed into the aisle and beyond the box, since she did not then know the exact size, weight and capacity for danger of the object she had seen on the floor as she entered. She further argues that after she later discovered the full situation, she was forced to face the risk because of a notice posted by the defendant, "TURN OUT LIGHTS WHEN NOT IN USE", or as she expresses her understanding of it, "turn out the light when finishing using it."

But this rule was obviously merely one of economy. It would not have been violated, upon any reasonable interpretation, if she had left the light on, quitted the aisle, and reported to her superior that she had done so. Under the existing circumstances, she was not done with the use of the light until she had gained the main aisle.

In this view, the cause of the plaintiff's injuries was her own act in switching off the light; the cause was not the defendant's negligence in permitting other lights to be defectively equipped, while imposing on the plaintiff the absolute duty of switching off the one effective light.

The same result would be reached under the emergency doctrine expressed in *Clairmont* v. *Cilley*, 85 N. H. 1. The plaintiff was under no immediate orders to undertake the risk. She was subjected to no emergency with respect to the safety of her employer's property, with respect to her own safety, or with respect to the performance of her work which required her to extinguish the light and face danger, rather than to leave the light on and retire in safety. She had free choice between safety and completely known danger, between staying in the service and quitting it. She had ample time for decision in her choice. Having chosen, she cannot say that she did not assume the risk. *Stone* v. *Johnson*, 89 N. H. 329.

*Judgment for the defendant.*

All concurred.