No. 44,457

GLEN SCHOOF, *Appellee,* v. ROBERT BYRD, *Appellant.*

(415 P. 2d 384)

Opinion filed June 11, 1966.

*John G. Atherton,* of Emporia, argued the cause and was on the brief for the appellant.

*David H. Heilman,* of Council Grove, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by an employee to recover damages for personal injuries sustained in a one-vehicle collision while driving his employer's cattle truck. Upon trial of the case to the court judgment was rendered for the employee on his petition in the sum of $15,774.64. Appeal has been duly perfected.

The employer sought by a cross petition to recover against the employee for damages to his truck and livestock, but the trial court ruled against the employer on his cross petition, and this phase of the case appears to have been abandoned on appeal.

The underlying issue on appeal is whether the evidence supports the findings and conclusions upon which judgment was rendered by the trial court.

On the 30th day of May, 1963, Glen Schoof (plaintiff-appellee) sustained serious personal injuries as a result of an accident which occurred while he was driving a truck owned by Robert Byrd (defendant-appellant). In the fall of 1962 the plaintiff was employed by the defendant as a part-time driver for his truck-semitrailer outfit, and was compensated by the defendant for hauling his cattle on the basis of 10¢ per loaded mile. The plaintiff was 64 years of age and had had 33 years' experience as a truck driver hauling livestock.

On the date of the accident, and for some time prior thereto, the defendant was engaged in the business of grazing, buying and selling livestock. He was the owner of a 1961 International truck or tractor and a 1961 40-foot American stock semitrailer which he used in his business.

In all the plaintiff made a total of between 75 and 100 round trips hauling cattle for the defendant during the course of his employment. Most of these trips were made to places within the state of Kansas from Council Grove. The plaintiff's employment was not

steady, but the defendant or someone on his behalf would call the plaintiff when he had a load of cattle to be hauled. Generally, the plaintiff received these telephone calls between 11:00 a. m. and 6:00 or 7:00 p. m. Upon receiving a call the plaintiff would have the defendant's truck serviced and would then start for his destination, pick up a load of cattle and return the cattle to Council Grove or to defendant's farm in Chase County, Kansas.

The plaintiff made eight trips to Amarillo, Texas, which were his longest trips. On all but one of the trips to Amarillo, other than the trip in question, the plaintiff stayed all night before making his return trip. On one prior occasion in April, 1963, the plaintiff left Council Grove at 5:00 p. m., drove all night and reached Dumas, Texas, the next day where he loaded cattle which he delivered to Amarillo. He then returned to Dumas where he loaded more cattle which he delivered to the defendant's ranch in Chase County. This trip began about 5:00 p. m. of the first day and ended at 5:00 a. m. of the third day. On this trip he took a little rest and lay down a couple of hours, but did not go to bed. The plaintiff testified the driving time to Amarillo from Council Grove was about eleven hours, and the mileage around 490 miles.

When the plaintiff was asked why he did not lay over on this occasion as he did on the other seven occasions when he went to Amarillo, he said:

"Well, we had those cattle there and they was supposed to come back here, and I just thought I could make it back all right, which I did."

On the morning of May 28, 1963, the plaintiff arose at about 6:00 a. m. and took some of his own calves to a sale at Hutchinson in his own pickup. He returned to Council Grove about 5:00 or 5:30 p. m. and the defendant called him by telephone. The plaintiff testified the defendant "requested" him to get the defendant's truck and drive to Greenville and McKinney, Texas, to pick up cattle. The plaintiff made no objection to the defendant's request concerning this trip to McKinney. He said he was not particularly tired at the time he received the call, but felt that he had put in a day.

The plaintiff then took the defendant's truck, had it serviced at Strong City, and started for McKinney, Texas, at 7:00 p. m. or later, a distance of approximately 450 miles. It was about 30 miles farther to Greenville, Texas. He arrived in McKinney at 8:00 a. m. on May 29, 1963, and then drove on to the sale barn at Greenville, Texas, where he loaded some cattle which the defendant had purchased. Thereupon he returned with the truck and reported to

the defendant at the sale barn in McKinney, where the defendant planned to purchase additional cattle to complete the load.

It was about noon on the 29th day of May, 1963, when the plaintiff returned to the McKinney sale barn. He then ate and slept for a short time on a seat at the sale barn until the defendant arrived at approximately 1:15 p. m.

The plaintiff testified on cross examination he made no remarks to the defendant as to the fact he had been without sleep. On this point the plaintiff further testified:

"Q. And during this time, did you make any remarks to him about your physical condition?

"A. No. He just said, 'stick around and I will'—I think—'I will have the load at four o'clock, just stick around here.' "

The plaintiff testified that was customarily what he did on previous occasions—waited around until a load was made up.

At about 4:00 or 4:30 p. m. the defendant had purchased a sufficient number of cattle for a load. As narrated in the record, the testimony of the plaintiff then proceeded as follows:

". . . He gave plaintiff the sale tickets and told him he could get going right on back with the cattle and be sure not to leave two or three behind because it was too far from home; that he wanted the cattle in Council Grove 'tomorrow morning, early' and that plaintiff could take whatever route he wanted to take back to Council Grove. That defendant then left at about 4:30 p. m., May 29, 1963, and this was the last plaintiff saw of defendant."

On cross examination plaintiff admitted he did not say anything to the defendant at that time about being tired or having gone without sleep.

When the additional cattle were loaded there were approximately 50 head in the semitrailer, and this was considered by the plaintiff a rather heavy load. The plaintiff left McKinney at 7:00 p. m. for Council Grove by way of U. S. Highway No. 75.

When the livestock in Greenville were originally loaded, the plaintiff observed the water troughs in the pens were dry and the cattle were licking the troughs, thus indicating that they were thirsty. This was called to the defendant's attention at McKinney but the defendant did not want the livestock on the truck unloaded.

When the truck was fully loaded at McKinney the defendant testified he presumed the livestock would be taken directly back to Council Grove, and that was the way it was customarily done when livestock were hauled for him.

After leaving McKinney, Texas, on the evening of May 29, 1963, the plaintiff made three stops before the collision. The first stop

was somewhere in North Texas at about 11:00 p. m. At this point the plaintiff drank some coffee, and three head of cattle that were down in the truck were gotten up on their feet. He testified:

"Q. What was your physical condition at this time?

"A. Well, I was pretty drowsy, and I thought, well, I will go in and get me some coffee and walk around a little bit, kinda rouse up a little bit, so I thought I was able to go on, and I went on."

The plaintiff then stopped again for the purpose of refueling just south of the Canadian River. At this point he testified:

"Q. Did you do anything else?

"A. I got some cattle up, I got all of the cattle up that was down, there was three or four down, got them all up but one and he was laying along the side and he wouldn't get up and I left him lay.

"Q. Did you drink coffee then?

"A. No, I didn't.

"Q. How were you feeling at that time, if you recall?

"A. I was just tired. I was just tired, and so I just—after moving around a little bit, I felt like I could go on until I did get tired out."

The plaintiff further testified he was experienced in hauling livestock and cattle, and said cattle that are not tired or hungry are not inclined to bawl or be restless as these cattle were on this occasion. He said the cattle were continually moving around in the truck causing it to shake; that overloading of livestock also causes them to react in the manner which the load did on this occasion.

The next stop made by the plaintiff was about two or three miles south of Neodesha, Kansas. Concerning this stop he testified:

"Q. And what was the occasion for stopping there, Mr. Schoof?

"A. Well, I commenced to feel kind of blurry and there was a place to pull off the side of the road, and I just got out of the truck and went around the truck and looked about the cattle and that is all I did.

[At this time there were two head of livestock down and he was unable to get one up, and the livestock were constantly on the move and restless.]

"Q. I think you said you were getting a little blurry. Was this before you stopped there south of Neodesha?

"A. Yes.

"Q. And describe what you mean by that?

"A. Well, by blurry I would say that your brain isn't working with your body. That is all I can say.

"Mr. Atherton: I am sorry, I didn't hear.

"The Witness: I said your brain wasn't working with your body.

"Q. You have driven trucks before, have there been occasions when you would become tired and fatigued any time in the past which you have had this, maybe become blurred?

"A. Oh, yes, yes."

Concerning this point on cross examination the plaintiff testified:

"Q. And why did you stop at this time?

"A. Well, I was just getting kinda tired, and I was afraid I would have trouble, you know, so I just pulled off. There was a place to pull off the side, and I pulled off and I got out, and the cattle was doing a lot of tramping around and moving the truck, and I got out and looked around and I got up what was down. I don't recollect just what there was, but there was still one that wouldn't get up, just bawl with the hot shot, wouldn't get up, so I just drove on.

"Q. Now, you say when you stopped, you were afraid you might have some trouble. What kind of trouble?

"A. Well, I was getting tired, too tired to drive, so I thought I would get out and try to get roused up.

"Q. Were you starting to get blurry eyed?

"A. Yes, some, yes.

"Q. Was your coordination somewhat affected, your brain not working with your body as I believe you stated?

"A. Yes, that's right, that's right.

"Q. Had you ever felt that way on other occasions?

"A. Oh, yes, I have quite a few times.

"Q. What did you do on those occasions?

"A. I generally stopped and slept.

"Q. Then you proceeded on through Neodesha?

"A. Yes.

"Q. And then the accident occurred?

"A. That's right."

On direct examination the plaintiff testified:

"Q. Where did you go then, Mr. Schoof, after you stopped south of Neodesha, Kansas?

"A. I drove on through Neodesha and I got out about two miles north of Neodesha and I just crossed an intersection there, and just seems as though I blurred out and as the front wheels got out on the rough ground there, it just brought me out and I seen it was too late, all of the cattle had shifted to the side and I couldn't get the truck back."

He testified at this point Highway No. 75 is a straight highway with blacktop surface. He further testified:

"Q. And you said at that time you blurred out and then when the front wheels went off, it shook you up, is that correct?

"A. That is right.

"Q. What did you do then?

"A. I tried to pull the truck up into the road, but the weight of the cattle, felt like the truck was going over all of the time, and I couldn't get it back.

"Q. About how fast were you driving at this time, Mr. Schoof?

"A. I would say between 40 and 50 miles an hour.

"Q. And what was the condition of the shoulder of the road or highway here at this point where you went off the road?

"A. It was about three feet off to where it sloped about a ninety degree.

"Q. And you said then you tried to pull it back on the highway, is that correct?

"A. Yes, sir.

"Q. And when you said the load shifted, what do you mean, the cattle shifted over to the right-hand side? Is that correct?

"A. Yes.

"Q. And you were traveling north?

"A. Yes.

"Q. Was there any obstructions confronting you down the road there, Mr. Schoof, as you were approaching?

"A. There was a bridge culvert.

"Q. Is that a concrete culvert or bridge?

"A. Yes, concrete.

"Q. And what did you do then? What did you do after you were unable to pull back on to the highway?

"A. Well, I seen I was going to hit that bridge, and I just give it a little pull to the right and I thought I could miss it, which I did.

"Q. In other words, you were headed straight for this concrete culvert before?

"A. That is right.

"Q. Then when you couldn't pull it out on the left, you pulled it to the right to avoid the head-on collision, is that correct?

"A. Yes, sir.

"Q. What was the terrain to the right that you were confronted with, Mr. Schoof?

"A. Well, quite a few trees there, and just a ravine, small little creek.

"Q. And is that the point at which the collision took place?

"A. Yes.

"Q. What do you recall—tell us exactly what happened then after you pulled the truck to the right to avoid this head-on collision with the culvert.

"A. Well, I went down across that slought, and that is where it knocked me until I didn't know just what happened, only I was getting a good shaking up."

On cross examination the plaintiff testified:

"Q. Now, you stated that on previous occasions you had blurred out before, but you had no accident as a result of this?

"A. Uh-huh.

"Q. Would you consider that to be a warning signal to you?

"A. Yes, it's a pretty good warning, but if you get—it is different whether you got livestock on or not. If you got livestock on, you can't stop and go to sleep.

"Q. I beg your pardon?

"A. If you got livestock on, you can't stop someplace and go to sleep with them with the shape they was in.

"Q. And you never made a practice of that?

"A. No, I didn't.

"Q. And that would be when you were driving for Mr. Byrd, or when you were driving for anyone else? Is that correct?

"A. Yes."

The posture of this case, as indicated by the foregoing testimony of the plaintiff himself, makes it unnecessary to consider many of the points asserted on appeal.

Generally, it may be said, the trial court made findings of fact and conclusions of law consistent with the plaintiff's theory of the case. Among what is denominated "Findings of Fact" are the following:

"22. The plaintiff was attempting to do everything possible to get his load of cattle to Council Grove because of the fact that the defendant had stated at some previous occasion that he would not use a driver who would stop for sleep or rest while livestock were loaded upon his truck.

"23. It is unsafe for a driver to drive or to be on duty for more than 16 consecutive hours.

"24. The defendant stated that he knew that the plaintiff was placed in a position of danger in attempting to drive for a long period of time without rest. The defendant was well aware of the fact that the distance was something more than 1,000 miles and that the plaintiff would be on continuous duty for more than 30 hours.

"25. The defendant had demanded and required the plaintiff to be continuously on duty beyond the realm of human endurance for a truck driver of any age, having placed him on such continuous duty for more than 30 hours."

The foregoing findings are challenged by the appellant on the ground they have no support in the evidence.

The trial court's conclusions of law are as follows:

"1. The Court has jurisdiction of all matters involved and the relationship of employer and employee existed.

"2. Where master orders a servant into a situation of danger, and obeying the command the servant is injured, he will not be charged with contributory negligence nor with the assumption of the risk unless the danger is so glaring that no prudent man would have encountered it even under orders, provided he acts with reasonable prudence in exercising such orders.

"3. The defendant ordered the plaintiff into the situation of danger and while obeying said command plaintiff was injured.

"4. The danger was not so glaring that a prudent man would not have encountered it.

"5. The plaintiff acted with reasonable prudence in executing the orders and commands of the defendant.

"6. The defendant was guilty of negligence.

"7. The plaintiff was not contributorily negligent and did not assume any risk. The plaintiff is accordingly awarded damages against the defendant in the total sum of $15,774.64, together with the costs of the action.

"8. The cross petition of the defendant is denied in toto."

A preliminary question raised by the appellee challenges the right of the appellant to be heard on appeal. The appellee contends the alleged assignments of error set forth by the appellant are not prop-

erly before this court for review because the trial court made findings of fact, conclusions of law, and a decision, but no objections were ever made to the findings of fact, conclusions of law or the decision, and no motion for a new trial was ever filed or heard.

Under these circumstances the appellee argues where a defendant makes no objections to the facts as found by the trial court and files no motion for a new trial, trial errors such as rulings on the admission of evidence, and whether the evidence supports the findings of fact, are not open to appellate review, citing *Brown v. Brown*, 146 Kan. 7, 68 P. 2d 1105; *Pedroja v. Pedroja*, 152 Kan. 82, 102 P. 2d 1012; *In re Estate of Goddard*, 176 Kan. 495, 271 P. 2d 759, and many other decisions of similar import. It is argued the only legal question presented by the appeal, therefore, is whether the findings made by the trial court, considered with the pleadings, support the conclusions of law and the judgment rendered.

The appellee also contends before trial errors will be considered on appellate review, they must have been raised in the trial court by a motion for a new trial, citing *Schmidt v. Cooper*, 194 Kan. 403, 399 P. 2d 888 (March 6, 1965, decision); and *State v. Carpenter*, 195 Kan. 162, 403 P. 2d 996, cert. den. 382 U. S. 948, 15 L. Ed. 2d 356, 86 S. Ct. 409 (July 10, 1965, decision).

Was it necessary for the appellant to object to the findings of fact and conclusions of law made by the trial court?

It may be conceded the decisions upon which the appellee relies hold in accordance with the proposition for which they were cited, but these decisions were based upon the law as it existed prior to passage of the new code, which became effective on January 1, 1964.

K. S. A. 60-252 (*b*) specifically pertains to findings made by the trial court. In pertinent part it reads:

". . . When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made a motion to amend them or a motion for judgment."

This provision of the statute means exactly what it says, and further elucidation is unnecessary. (See Gard, Kansas Code of Civil Procedure Annotated, § 60-252 (*b*), p. 245; and 3 Vernon's Kansas Statutes Annotated, Code of Civil Procedure, § 60-252, ¶¶ 252.3, 252.4, pp. 267, 268.)

Was it necessary for the appellant to file a motion for a new trial?

The petition in the instant case was filed March 17, 1964, and all

proceedings in the case were conducted subsequent thereto. It is therefore apparent the rules of appellate procedure under the new code are applicable.

All of the decisions cited by the appellee, except two, were rendered prior to the effective date of the new code of civil procedure, and the rules relating to appellate practice adopted pursuant thereto. Prior to the effective date of the new code and the rules thereunder, it was necessary to file a motion for a new trial and appeal from an adverse ruling thereon if appellate review was desired on a question touching the sufficiency of the evidence to support findings of fact or judgment.

The two cases upon which the appellee relies that were decided after the effective date of the new code are *Schmidt v. Cooper,* supra, and *State v. Carpenter,* supra. The *Carpenter* case may be ignored because it is a criminal and not a civil case. Under the rules of the Supreme Court relating to appellate practice, which became effective January 1, 1964, Rule No. 1 (*f*) (194 Kan. xii) provides that all rules relating to appellate procedure in criminal cases in force on December 31, 1963, shall remain in full force and effect and be applicable to all appeals in criminal cases, until further order of the court.

Rule No. 6 (*d*) of the Supreme Court, effective January 1, 1964, states:

". . . An issue may be raised in the statement of points regardless of whether a motion for a new trial was filed; . . ." (194 Kan. xiv.)

If per chance the above rule could be construed as an amendment of the new code of civil procedure, such power is conferred upon the Supreme Court by K. S. A. 60-2607. The rules of the Supreme Court relating to appellate practice, which became effective January 1, 1964, under the new code of civil procedure, were first published in the Supreme Court reports in November, 1963. (192 Kan., Advance sheet No. 1.)

In *Schmidt v. Cooper,* supra, the opinion was filed March 6, 1965, and clearly holds that before trial errors will be considered on appellate review, they must have been raised in the trial court by a motion for a new trial. On the surface this statement would appear to be in conflict with Rule No. 6 (*d*).

The appeal in *Schmidt v. Cooper,* supra, was transmitted to the clerk of the Supreme Court on December 19, 1963. A careful reading of Rule No. 1 (*a*) and (*b*) (effective January 1, 1964) will show

that Rule No. 6 (*d*) of the new rules does not apply to appeals transmitted by the clerk of the trial court prior to January 1, 1964. It is therefore apparent on the point in question *Schmidt v. Cooper, supra,* was decided under the law as it existed prior to January 1, 1964.

We therefore hold the appellant is entitled to be heard on his appeal, and a motion for a new trial was not necessary in this case to perfect an appeal raising questions touching the sufficiency of the evidence to support the findings of fact or judgment.

This case was tried to the court without a jury and at the close of the plaintiff's evidence, the defendant moved for a dismissal of the plaintiff's case pursuant to K. S. A. 60-241 (*b*), or in the alternative, for a directed verdict pursuant to K. S. A. 60-250. The motion was overruled. Again at the close of all the evidence the defendant moved for a directed verdict, and this motion was also overruled.

The manner in which this case was tried and the preparation of the record on appeal leave much to be desired when parties seek appellate review. For example, it is impossible to determine when the plaintiff rested his case and the defendant's motion for a dismissal was interposed. The record does not disclose when during the trial of the case the depositions of the plaintiff and the defendant were admitted. It merely discloses the rulings of the court on requests for admission of the depositions. On this point the trial court said:

"I am going to admit the part that you wish to admit, Mr. Heilman, and I am going to admit any part that Mr. Atherton wishes to have introduced on behalf of the defendant, even up to the extent that I will admit the deposition in its entirety. In other words,—is the ruling clear?"

Upon this ruling counsel for the plaintiff then offered "the deposition in its entirety" without indicating whether this was the deposition of the defendant or the plaintiff. Counsel for the defendant, while recognizing the trial court's ruling as most unusual, said:

". . . I would agree that we might as well put the whole thing in subject to the objections to the questions. I think when Your Honor reads the thing you will be well aware of my objections the way some of the questions were phrased. They were double; they were assumptive; they were certainly not in good form. In as much as we are trying this matter to Your Honor, I am sure you will take that fact into consideration."

Here, again, there was no indication which of the two depositions was offered by counsel for the defendant.

The trial court's reply in ruling upon objections is as follows:

"I think that is one trouble we are having with the discovery depositions, some of the questions, and I am not referring to these particularly because I haven't read them, getting beyond the rules of evidence, getting beyond the rule of legitimate questions. If it does, I will try to exclude them from the consideration of the Court."

Nowhere in the record is there any indication as to what questions and answers were stricken from the depositions or excluded from the consideration of the court.

Under the circumstances, we shall attempt to dispose of this appeal on the whole of the evidence as it appears in the record, without attempting to distinguish that which was offered on behalf of the plaintiff or the defendant.

In our view the disposition of this appeal does not turn upon whether or not the defendant was negligent. Therefore, we shall assume the defendant was negligent in the particulars hereafter discussed in this opinion. This assumption, however, should not be construed as a determination by this court that the record discloses sufficient evidence to support what is denominated "Findings of Fact," numbered 22, 23, 24 and 25. In fact, in some particulars the evidence does not support the findings, and the failure of the trial court to distinguish between "driving time" and "duty time" gives an erroneous impression to the conclusions of fact where the admitted one-way driving time was only eleven hours. Generally, it may be said the defendant's testimony does not help the plaintiff any more than does the plaintiff's testimony.

If it can be said upon the record here presented the plaintiff is guilty of contributory negligence which was a proximate cause of his injury, or if the plaintiff knew the conditions of his employment, or by the exercise of reasonable care on his part could have known of the danger, if any, to which he was exposed, but notwithstanding the premises continued his work and employment, thereby assuming the risk of being injured, he cannot recover.

A rule of law frequently applied by this court is that a verdict cannot be upset if there is any evidence in the record to support it, where such issue is clearly presented without complicating factors, *but such rule yields to the impact of admissions made by a party in his testimony while a witness in the case,* and such admissions are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross examination of the party. (*Hiniger v. Judy,* 194 Kan. 155, 398

P. 2d 305, Syl. ¶ 2; *Reeder v. Guaranteed Foods, Inc.*, 194 Kan. 386, 393, 399 P. 2d 822; and *Bellport v. Harder*, 196 Kan. 294, 299, 411 P. 2d 725.)

The plaintiff concedes in his testimony the truck-semitrailer outfit, owned by the defendant and driven by the plaintiff, was in perfect mechanical condition, and that the accident was not caused by any defect in the equipment furnished to him by the defendant.

Here the plaintiff by his own admissions stated he became blurry eyed approximately three miles south of Neodesha where he stopped; that he considered this a pretty good warning; and that it was dangerous to drive after such warning when your brain isn't working with your body.

The trial court by conclusion of law No. 2 attempted to circumvent contributory negligence and the doctrine of assumption of risk. Conclusion of law No. 2 is identical with Syllabus ¶ 2 in *Railroad Co. v. Morris*, 76 Kan. 836, 93 Pac. 153. It reads:

"Where a master orders a servant into a situation of danger, and in obeying the command the servant is injured, he will not be charged with contributory negligence, or with an assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under such orders, provided he acts with reasonable prudence in executing such orders."

In that case the employee, Morris, suffered personal injuries caused in the loss of his leg while attempting to stop a freight car which was rolling upon the track. Morris was working along the track when the boxcar was rolling upon the track unattended. Morris heard the conductor or someone make the statement, " 'For God's sake, stop that car.' " Morris then ran over to the car and in attempting to stop it was injured and received damages for the loss of his leg. In the opinion the court stated:

"Whether the plaintiff was negligent in the performance of the duty assigned to him must be determined in the light of the situation in which he was placed. If his act was such as a reasonably prudent man would have done, it was not negligent, although some other course would have been absolutely safe. (*Brinkmeier v. Railway Co.*, 69 Kan. 738, 77 Pac. 586.) *It must be remembered that this was a sudden call to a dangerous service, which had to be performed then or not at all. . . .*" (p. 845.) (Emphasis added.)

Other cases in which this court adhered to the doctrine set forth in *Railroad Co. v. Morris*, supra, are *Spear v. City of Wichita*, 113 Kan. 686, 216 Pac. 305, Syl. ¶ 3; and *Rush v. Brown*, 153 Kan. 59, 109 P. 2d 84, Syl. ¶ 2.

Attention is invited to the emphasized language quoted from the

*Morris* case. This was a sudden call to a dangerous service. Further in the opinion the court says when the plaintiff was called to the service, he was bound to use such means as reasonable prudence dictated *in the emergency* in which he was placed. In supporting its decision upholding a judgment in favor of the plaintiff, the court cited and relied upon *Railroad Co. v. Langley,* 70 Kan. 453, 78 Pac. 858; and *Wurtenberger v. Railway Co.,* 68 Kan. 642, 75 Pac. 1049.

Cases applying the doctrine relied upon by the trial court (see conclusion No. 2) are best illustrated by language used in *Railroad Co. v. Langley,* supra, where the court said:

"Again, where one, by the negligent act of another, is placed in a position of danger which requires immediate and rapid action, without time to deliberate as to the better course to pursue, he is not held to the strict accountability that is required of one situated in more favorable circumstances. Contributory negligence is not necessarily chargeable to one who fails to exercise the greatest prudence, or best judgment, in a case where he is required to act suddenly or in an emergency. . . ." (p. 461.)

It may be conceded contributory negligence is ordinarily a question for the trier of the facts (*Spear v. City of Wichita,* supra), but the doctrine applied by the trial court in the instant case to avoid the contributory negligence of the plaintiff is founded upon a situation in which the plaintiff is *suddenly called* into a dangerous situation, or where an *emergency* exists. The admitted statement of the plaintiff does not present this situation.

In the instant case the plaintiff was a truck driver with some 33 years of experience. He was requested to perform an act which he had performed on numerous occasions—that of driving to a given place, loading cattle and hauling cattle to another location. This was not a sudden call to the plaintiff. While he was never sure when the defendant might call to request him to make a trip, he had made a total of between 75 and 100 trips for the defendant during the course of his employment by the defendant, and all but three of these trips were prior to May 30, 1963. Here the plaintiff knew where he was requested to go, the approximate distance and time of arrival. He knew his own physical condition, how long he had been without sleep and rest, and how far he had already driven that day. The plaintiff had ample opportunity when called by telephone to consider the request of the defendant, and to decide if he was able to make the trip. There was nothing requiring spontaneous action on his part.

Here the plaintiff and not the defendant was the experienced

truck driver. The plaintiff, therefore, should have had greater knowledge and appreciation of the risks involved in making the trip. Furthermore, in the "emergency" or "sudden call" cases, there was one act to be performed which did not extend over a long period of time. Here the trip to Texas was not of itself a "situation of danger." It was merely the job or work for which the plaintiff had been hired. If the trip or any part of the trip could become a "situation of danger" it would be because of some intervening factor over which the defendant, who was not present, had no control. The intervening factor or factors could be any number of things, including the fatigue of the plaintiff driver.

We hold as a matter of law the plaintiff convicted himself of contributory negligence, which was a proximate cause of his injury, by admissions made in his own testimony. He is chargeable with contributory negligence because he failed to exercise due care and caution to avoid an accident. The situation of danger became so glaring to him that anyone in the exercise of ordinary care and prudence would not have continued driving beyond Neodesha without some rest.

Another defense frequently asserted in a negligence action of this type, as here, is the doctrine of assumed risk. To recover the plaintiff must show not only that he is free from negligence, but also that he was free from the doctrine of assumption of risk.

Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee or servant agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee or servant. (*Blackmore v. Auer*, 187 Kan. 434, 357 P. 2d 765.)

The injuries for which an employee is barred from recovery by virtue of the doctrine of assumed risk include but do not extend beyond those which result from the ordinary risks of the employment or such as are incident thereto, and of which the employee has knowledge, actual or implied, or of which it may be said that he is presumed to know. (*Blackmore v. Auer*, supra; and 35 Am. Jur., Master and Servant, § 299, p. 722.)

Under the doctrine of assumed risk, one who voluntarily exposes himself or his property to a known and appreciated danger *due to*

*the negligence of another* may not recover for injuries sustained thereby. Thus, in 65 C. J. S., Negligence, § 174, it is said:

"The mere encountering of a risk, by doing something dangerous, does not, legally speaking, constitute assumption of risk; it is only when the risk exists in spite of the exercise of due care *or when the risk results from negligence which is obvious that it is assumed by the person injured;* and the law of assumed risk applies generally to those dangers attendant on the act or method when done in a manner free from negligence. *Assumption of risk arises where the proximate cause of an injury is referable to the conduct of the injured person after knowledge of the risk of injury, and not to the conduct of defendant who in the first instance created the risk;* but it is predicated on the factual situation of defendant's acts alone creating the danger and causing the accident, with plaintiff's act being that of exposing himself to such obvious danger with appreciation thereof, which resulted in the injury. The test of whether plaintiff assumed the risk of a danger from which injury resulted is whether an ordinary prudent person would under the same or similar circumstances have incurred the risk which plaintiff's conduct involved." (pp. 850, 851.) (Emphasis added.)

It has heretofore been assumed, for purposes of appellate review, that the defendant was negligent. Such negligence, however, if any, must be assumed from the defendant's act in requesting the plaintiff to be on continuous duty for a period of approximately 30 hours. It would be an unwarranted assumption, upon the record here presented, that this constituted an order by the defendant that the plaintiff go without rest for a period of 30 hours. There is evidence in the record that the time a truck driver spends away from his home base is considered to be "duty time." Under this definition a truck driver while sleeping away from his home base during an extended trucking tour is on duty. Nowhere in the record is there any evidence that the defendant knew or had knowledge that the plaintiff was sleepy or tired because he lacked sufficient sleep on the trip in question. The defendant testified it was approximately 19 hours between the time he first called the plaintiff and the time he saw him at McKinney, Texas. Where the driving time from Council Grove to McKinney was only 11 hours by the plaintiff's admission, the defendant assumed there was time for rest.

Nevertheless, if the doctrine of assumed risk bars the plaintiff's recovery in this case, it is because the negligence (assumed) of the defendant created the risk which the plaintiff assumed.

The situation is much like that presented in *Conboy v. Crofoot*, 194 Kan. 46, 397 P. 2d 326. There the plaintiff knew he would be required to perform his duties in a cattle feedlot which was wet,

muddy and cold. The temperature was below freezing, and as a result of his working in those conditions his feet were frostbitten. There this court stated:

"As here presented, the case is simply one where the defendants ordered the plaintiff to do certain work, leaving him free to adjust his efforts to the prevailing weather and his own physical capacities. The plaintiff was the only one who knew his feet were cold and was the only person who was aware that danger existed. Until that danger became known to the defendants, under the circumstances alleged, there was neither a duty nor an opportunity for them to protect the plaintiff in any manner." (p. 51.)

Here the plaintiff was requested to drive a truck to Texas, load cattle and return. He was allowed to use his own judgment as to how to accomplish the job as he was an experienced truck driver. Plaintiff was the only person who knew that he was becoming tired and fatigued, and was the only person aware that danger existed. There was no evidence that the defendant was ever aware of plaintiff's fatigue, and the danger to the plaintiff resulting from such fatigue. The defendant knew the plaintiff was on a long trip, similar to previous trips, just as in the *Conboy* case the defendants there knew Conboy was working in the muddy and cold feedlot, but the defendant had no knowledge of the immediate danger just prior to the accident.

In *Blackmore v. Auer,* supra, this court distinguished *Rush v. Brown,* supra, by showing that the farm laborer there was ordered to climb from a tractor over and onto the hitch assembly of a disc tiller, an obvious situation of danger into which the master ordered the servant. In the *Blackmore* case the employee was ordered to ride on the flat bed wagon and load bales while the wagon was moving. This court in *Blackmore* said:

". . . The flat bed wagon was the usual and customary place for one to ride when loading bales, and Mr. Blackmore was not ordered into a position of danger. It was simply the place in which he performed his work—the stacking of bales onto the wagon where he stood." (pp. 446, 447.)

If it can be said that a dangerous situation did in fact exist, all of the factors which contributed to that situation were fully known to the plaintiff. In addition to the facts in this case, he knew that on other occasions in the past when he became tired and fatigued, he would become blurred or blurry and his brain would not work with his body. This the plaintiff knew prior to starting on his trip.

The foregoing discussion of the doctrine of assumed risk should

not conclude without giving recognition to a summary of the law as stated in *Uhlrig v. Shortt*, 194 Kan. 68, 397 P. 2d 321, as follows:

"At the outset, it may be stated that it is the duty of the employer to provide for his employees a safe place to work, including structure and surroundings, and safe and suitable machinery, tools and appliances with which to work. (*Fishburn v. International Harvester Co.*, 157 Kan. 43, 138 P. 2d 471, and *Taylor v. Hostetler*, 186 Kan. 788, 352 P. 2d 1042.) However, the general rule has so many qualifications, conditions and exceptions that it is seldom, if ever, that it can be used as a single factor to fix the liability of the master for injury to his servant.

"An employee cannot recover from an employer unless the employer has been guilty of negligence. The employer must have been guilty of some breach of duty which he owed to the servant. The employer is not to be held liable for an injury to an employee simply because of danger which was inherent in the employment, whether in the place of employment or the cause of the danger inherent in the tools, machinery or appliances with which the work must be performed. A master is not an insurer against injuries which his servants may incur in the discharge of their duties. See, *e. g., West v. Packing Co.*, 86 Kan. 890, 122 Pac. 1024; *Udey v. City of Winfield*, 97 Kan. 279, 155 Pac. 43; *Gentry v. Davis, Agent*, 115 Kan. 335, 222 Pac. 769, and *Hunter v. Barnsdall Refining Co.*, 126 Kan. 277, 268 Pac. 86.

"There can be no liability on the part of the employer where it appears that the employee's knowledge of the danger was equal to or surpassed that of the employer. See, *e. g., Fletcher v. City of Ellsworth*, 53 Kan. 751, 37 Pac. 115; *Bank v. Haid*, 97 Kan. 297, 155 Pac. 57; *Railway Co. v. Stone*, 77 Kan. 642, 95 Pac. 1949; and *Ivey v. Railroad Co.*, 99 Kan. 613, 162 Pac. 288." (pp. 71, 72.)

Further in the opinion the court said:

". . . One, knowing all the danger and peril of pursuing a given course and being under no compulsion to encounter the same, who freely and voluntarily continues therein, cannot recover damages for injuries he may suffer. . . ." (p. 73.)

Turning again to *Conboy v. Crofoot*, supra, the court said:

"When the plaintiff accepted employment from the defendants, he knew that he would be required to perform his duties outdoors in cattle feeding lots which would be wet, muddy and cold. Assuming, as we must, that the plaintiff was a person of ordinary intelligence, he knew his own physical condition and his ability to endure the cold. There was a period of time in which the plaintiff was not in danger, presumably the longer he stood in the alley the colder his feet became. While he might not have been able to definitely determine the amount of cold his feet could stand under the prevailing conditions, yet as to that risk he knew better than anyone else how long he ought, for his own safety, to continue to work. That fact was known to the plaintiff alone and he alone could have prevented his injury by informing the defendants of the condition of his feet and requesting that he go warm them or obtain suitable footwear.

Whether the plaintiff's undertaking at that time was usual or unusual, the risk could not have been more obvious." (pp. 50, 51.)

It would appear that one of the risks incident to driving cattle trucks over long periods of time would be lack of sleep and rest resulting in fatigue. When a person is intelligent enough to understand the physical effects of lack of sleep and rest, he assumes the risk for a continuance in service, and should not be allowed to recover for the suffering and inconvenience caused by such lack of sleep and rest. It would also appear when the plaintiff accepted the job of driving the defendant's truck to Texas for a load of cattle which were to be returned to Council Grove, he knew that trip would be long, and that he would be required to go for a period of time without sleep. He also knew how long he had been without sleep and rest prior to starting the trip to Texas. This fact, which would have a direct bearing on how long he could go without additional sleep and rest, was known only to the plaintiff. As in the *Conboy* case he was not in immediate danger because of lack of sleep and rest, but obviously the longer he stayed awake, the more tired and fatigued he would become. He knew better than anyone else how long he could safely drive without sleep and rest. He alone could have prevented his injury by informing the defendant of his fatigue and lack of sleep when he last saw him in McKinney; or later, if it was impossible to notify the defendant, by stopping in order to avoid injury to himself and damages to the vehicle he was driving and the cattle he was hauling. The risk to the plaintiff could not have been more obvious. The reason plaintiff gave for stopping shortly prior to the accident was that he "was getting tired, too tired to drive." As a result the plaintiff is barred from recovery under the doctrine of assumed risk.

The same result would be reached under the emergency doctrine. The plaintiff was under no immediate orders to undertake the risk. He was subjected to no emergency with respect to the safety of his employer's property, with respect to his own safety, or with respect to the performance of his work, which required him to service the defendant's truck and proceed to McKinney, Texas, facing the dangers incident to the trip. He could have declined the trip and stayed at home in safety. He had the free choice between safety and completely known dangers, between driving for the defendant and declining to drive. He had ample time to make his decision. Having chosen, he cannot say that he did not assume the risk. (See, *Gelinas v. Company*, 90 N. H. 312, 8 A. 2d 753 [1939].)

In conclusion we hold, as a matter of law, the plaintiff by his own admissions convicted himself of contributory negligence which was a proximate cause of his injuries, and assumed the risk of his employment. As a result the plaintiff is barred from recovery. It follows the evidence did not support the conclusions of the trial court or its judgment.

The judgment of the lower court is reversed.

FROMME, J., not participating.